Revised August 4, 1998

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 97-30422

KAYE L. ROBIN,

Plaintiff-Appellant,

versus

METROPOLITAN LIFE
INSURANCE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

July 30, 1998

Before GARWOOD, JONES and WIENER, Circuit Judges.

WIENER, Circuit Judge:

At the vortex of this appeal is a group life insurance policy
("the Policy") issued by Defendant-Appellee Metropolitan Life
Insurance Company ("MetLife") to St. Paul Fire & Marine Insurance
Company ("St. Paul") as one facet of St. Paul's comprehensive
employee benefit package, the Policy concededly being a "plan

regulated by ERISA."[1]  In bringing this appeal, Plaintiff-Appellant Kaye L. Robin, widow of Randy Robin ("Decedent"), asks us to reverse the adverse results of a lawsuit she filed in a state court of Louisiana, which was removed to federal district court where she was denied recovery.[2]  For the reasons set forth below, we affirm.

I

FACTS AND PROCEEDINGS

St. Paul sponsors a multi-faceted employee benefit program ("the St. Paul Plan") which includes, inter alia, group life insurance coverage for its participating employees.  At all times relevant to this case, the life insurance coverage under the St. Paul Plan was provided by MetLife, which was vested with full discretionary authority to interpret the provisions of the Policy and determine entitlement to benefits under it.

While he was employed by St. Paul, Decedent had life insurance coverage of $187,000 under the Policy, with the proceeds payable to Robin as his designated beneficiary.  After working for St. Paul for approximately seven years, Decedent voluntarily terminated his employment effective May 13, 1994, to accept a job with another insurance company, starting three days later.

---

[1]Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461.

[2]The district court's federal removal jurisdiction was grounded in the federal question under ERISA and diversity of citizenship.

As an employee covered under the Policy, Decedent was required to contribute a portion of the premium for his coverage. Decedent made his monthly contribution through payroll deductions withheld by St. Paul as his employer. Neither Decedent nor any other participating employee paid premiums directly to MetLife. Rather, St. Paul remitted a single monthly premium payment to MetLife for all covered employees for the calendar month in question. Such a monthly lump sum premium payment to MetLife from St. Paul comprised its share and each covered employee's share of the aggregate premium cost for that month.

As explained in the St. Paul Plan's Summary Plan Description (SPD), a participating employee's life insurance coverage terminates at "[t]he end of the period for which you made the <u>last required</u> contribution."[3] Other relevant provisions of the Policy, as explained in the SPD, include (1) conversion rights, under which a departing employee could acquire an individual life insurance policy from MetLife by applying directly to MetLife "within 31 days of the day your coverage ends" under the St. Paul Plan; (2) continuation rights for employees not domiciled in Minnesota, under which the insurance proceeds would be paid if the employee should die "within 31 days after coverage with the St. Paul Company ends — even if you do not apply for a conversion policy"; and (3) <u>for Minnesota residents only</u>, the right to continue group life

---

[3](Emphasis added).

coverage for up to eighteen months after termination of employment, provided such a Minnesota resident notifies St. Paul's COBRA administrator, DCA, Inc. ("DCA").[4]  At no time relevant to this case was Decedent ever a resident of Minnesota.[5]

Decedent died suddenly and unexpectedly on July 3, 1994.  The record contains no direct evidence that Decedent ever stated that he was seriously considering exercising his conversion right under the Policy or that he ever contacted MetLife, St. Paul, or DCA about that matter.  In fact, he acquired $100,000 group life coverage by virtue of his new employment, indicating that if he ever considered continuation or conversion he had abandoned such thoughts.

After Decedent's death, Robin came across a June 4, 1994, notice that Decedent had received from DCA, which she construes as indicative that Decedent had sixty (60) days following May 13, 1994 (the effective date of his severance of employment with St. Paul), to continue coverage under the Policy or convert to an individual policy.  Apparently DCA inadvertently sent Decedent the notice intended for Minnesota residents.  Although the form notice received by Decedent identified the continuation and conversion

_____

[4]ERISA was amended in part by the Consolidated Omnibus Budget Reconciliation Act (COBRA) without, however, affecting life insurance.

[5]Another provision applicable to each Minnesota resident was that his continuation coverage would terminate automatically upon acquisition of life insurance coverage under a new group policy.

4

rights as guaranteed under Minnesota law, it failed to add that those statutory rights inured to the benefit of Minnesota residents only.[6]

Nothing in the SPD, the Policy, or anything else in the record reflects either a legal or factual relationship between DCA and MetLife: DCA is St. Paul's agent for some functions under the St. Paul Plan. On the other hand, MetLife is the issuer and administrator of the Policy which, as noted, provides the life insurance aspect of the St. Paul Plan.

St. Paul had advised MetLife early on that the first two payroll deductions in each calendar month satisfy the entire employee contribution obligation toward his total premium cost of coverage for that month. Following Decedent's resignation, MetLife was informed by St. Paul that two such deductions ── his "last required contribution"[7] ── had been withheld from Decedent's paychecks to cover his contribution for May 1994, his final calendar month of coverage. On the basis of this information and applicable provisions of the SPD and the Policy, MetLife determined that Decedent's coverage under the Policy ended on May 31, 1994,

---

[6]Robin contends that she received advice to the effect that she could complete the continuation or conversion form even after Decedent's death and that she completed and mailed the forms to DCA on July 8, together with a premium for future periods. In her appellate brief, Robin asserts that this advice was furnished by "St. Paul and/or MetLife," but MetLife flatly denies ever having given such counsel.

[7]See text accompanying n.3 supra.

5

the last day of the calendar month in which his employment and his participation in the St. Paul Plan ceased. MetLife received no premium payment from St. Paul — its only source — for coverage of Decedent after the group premium remitted by St. Paul for the month of May 1994.

Decedent's final paycheck was issued on May 22, 1994, some nine days following the effective date of his employment termination with St. Paul. From this paycheck St. Paul made a deduction identified as Decedent's portion of the premium for his group life coverage until the next payroll period, which would have ended on June 5, 1994, St. Paul's next payday, had Decedent still been employed there. To the extent St. Paul, as Decedent's employer, may have erroneously deducted premium costs from his last paycheck or misidentified a coverage term after May 31, 1994, or both, any estoppel claim would involve St. Paul (and, possibly, DCA) — with which Robin has settled — but not MetLife. Moreover, as Decedent was ineligible for coverage (other than continuation coverage) under the Policy after he left St. Paul's employ, any excess employee contribution deducted from his last paycheck could not — by SPD definition — have been "required."

Robin demanded payment of death benefits under the Policy from MetLife. The claim was rejected by MetLife which, based on the information supplied to it by St. Paul and construed in light of the SPD and the Policy, determined that Decedent's group coverage expired May 31, 1994, thirty-three days prior to his death, thereby

6

eschewing both conversion and continuation. MetLife interpreted the provisions, both conversion and continuation, to require the triggering events –– notice and premium payment for conversion; death of the formerly insured ex-employee for continuation benefits –– to occur within thirty-one days following the May 31 termination of coverage, pointing out that, when Decedent died thirty-three days after May 31 without having converted, both his continuation benefits and his conversion option evanesced.

After her claim was denied, Robin filed suit against MetLife in state court seeking life insurance proceeds under the Policy and penalties under Louisiana statutory provisions, plus court costs and attorneys' fees. MetLife removed the case to district court on alternative jurisdictional grounds of federal question and diversity of citizenship, then filed a motion for summary judgment. Robin subsequently impleaded St. Paul and DCA as additional defendants. The district court eventually granted summary judgment for MetLife on Robin's state law breach of contract and statutory penalty claims, holding that they are preempted by ERISA; but the court deferred ruling on the substantive ERISA portion of MetLife's summary judgment motion except to acknowledge that abuse of discretion is the appropriate standard of review for MetLife's policy interpretation and coverage determinations. Ultimately, the district court granted MetLife's summary judgment motion to dismiss Robin's remaining claims against it, concluding that MetLife had

7

not abused its discretion in rejecting her claims.[8]  After the court entered judgment in favor of MetLife, Robin timely filed a notice of appeal.

## II

## ANALYSIS

### A.   Standard of Review

The district court disposed of Robin's claims against MetLife by granting summary judgments, first as to her state law breach of contract and statutory claims, which the court held to be preempted by ERISA; second by holding that MetLife had correctly interpreted and rejected Robin's conversion and continuation claims under the applicable Louisiana statute,[9] which the court found to be exempt from ERISA preemption as regulating insurance; and third, by holding that MetLife had not abused the discretion with which it was vested by provisions of the Policy and the St. Paul Plan when, based on all information furnished to it, MetLife denied death benefits under the Policy.  We review these legal and ERISA preemption rulings of the district court on summary judgment under the well known de novo standard.

### B.   Scope of Review

Robin has not appealed the district court's holdings that

---

[8]The district court denied motions for summary judgment filed by St. Paul and DCA seeking dismissal of Robin's claims against them, but she eventually settled with both of those defendants.

[9]La. Rev. Stat. Ann. § 22:176 (West 1995).

(1) ERISA preempts the penalty claims she advanced under state law,[10] (2) abuse of discretion is the proper standard for the district court to apply in reviewing MetLife's determination of Robin's entitlement to life insurance benefits under the Policy, and (3) a jury trial is not available on ERISA claims. Consequently, on appeal we need address only Robin's contentions that the district court erred in (a) sustaining MetLife's decisions on state law insurance matters not preempted by ERISA, and (b) holding that her claim of estoppel or detrimental reliance against MetLife, grounded in the purportedly misleading notice sent to Decedent — not by MetLife but by St. Paul's agent, DCA — is preempted by ERISA. We proceed to review these remaining claims de novo.

C.  Continuation and Conversion under the Louisiana Insurance Code[11]

Here, as in the district court, Robin insists that her claims for continuation of coverage under the Policy, through and including the date of Decedent's death and thereafter for the continued viability of his right to convert, even after his death, are grounded in the provisions of the Louisiana Insurance Code that govern continuation and conversion rights.[12] As such, she contends, her claim is not preempted by ERISA because state statutes that

---

[10]See id. §§ 22:656-57.

[11]Id. § 22:176.

[12]Id.

9

regulate the business of insurance are excepted from ERISA's otherwise pervasive preemption of all state law "related to" an employee benefit plan.[13] On appeal, MetLife notes but does not complain that the district court likely erred as a matter of law in holding that ERISA preemption does not trump the Louisiana statute in question on this particular claim. Although we might or might not agree with that ruling on preemption were we to address it, we need not and therefore do not. Rather, we assume arguendo that the district court got it right on this preemption issue and proceed to review the court's holding.

Section 176 of the Louisiana Insurance Code[14] mandates the inclusion of thirteen specific provisions in virtually every policy of group life insurance. Relevant to the instant consideration are the three among those thirteen mandated provisions that are found in paragraphs (9), (10), and (12). They list, in pertinent part:

> **(9) Continuation to end of premium period:** A provision . . . that the termination of the employment of any employee . . . shall not terminate the insurance of such employee . . . under the group policy until the expiration of such period for which the premium for such employee or member has been paid, not exceeding thirty-one days.
>
> **(10) Conversion on termination of eligibility:** A provision that if the insurance . . . on an

---

[13]29 U.S.C. § 1144(b)(2)(A); Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 728 n.2 (1985).

[14]La. Rev. Stat. Ann. § 22:176.

10

> individual covered under the policy ceases because of termination of employment . . . , such individual shall be entitled to have issued to him by the insurer . . . an individual policy of life insurance without disability or other supplementary benefits, provided application for the individual policy shall be made and the first premium paid to the insurer within thirty-one days after such termination [of employment].
>
> . . .
>
> **(12) Death pending conversion:** A provision that if a person insured under the group policy dies during the period within which he would have been entitled to have an individual policy issued to him in accordance with Paragraph[](10) . . . of this Section and before such an individual policy shall have become effective, the amount of life insurance which he would have been entitled to have issued to him under such individual policy shall be payable as a claim under the group policy, whether or not application for the individual policy or the payment of the first premium therefor has been made.

We find nothing ambiguous in the quoted provisions of § 176, and —— continuing to assume arguendo that Robin's claims under the Louisiana Insurance Code are not preempted by ERISA —— hold that the plain wording of these provisions affords no recovery for Robin, given the sequence and timing of occurrences pertinent to this case.

First, as to paragraph (9), MetLife has never questioned that Decedent's coverage under the Policy continued to the end of the appropriate premium period, i.e., the expiration of the "period for which the <u>premium for such employee . . . has been paid</u> [<u>not</u>, as Robin contends, the period for which such employee has paid his

11

portion of the premium], not exceeding thirty-one days." We begin by reiterating that the premium for Decedent's coverage, and that of every other participating St. Paul employee, comprises both employer and employee contributions, and that neither Robin nor any other participating employee directly pays MetLife any part of the premium for his coverage. Instead, as noted earlier, a single premium for all covered employees is paid to MetLife by St. Paul —— each calendar month, for that calendar month's coverage. We note next that, for purposes of paragraph (9), Decedent's employment terminated during the month of May 1994, and that St. Paul's last premium payment to MetLife that included coverage for Decedent was the payment for the calendar month of May 1994. Thus the "period for which the premium for such employee . . . [was] paid" was the month of May. Consequently, the continuation of coverage mandated by paragraph (9) following Decedent's May 13 employment termination was not required to extend beyond May 31. But even if the "not exceeding thirty-one days" proviso of paragraph (9) were (mis)read to tack thirty-one days of continued coverage onto Decedent's entire last period of coverage, such putative continued coverage would have commenced on June 1 and expired on July 1, two full days prior to his death. Clearly, paragraph (9) provides no support for Robin's continuation claim.

Paragraph (10) of § 176 likewise avails Robin nothing. Although Decedent was eligible under paragraph (10) to convert to an individual policy after his group coverage under the Policy

12

"cease[d] because of termination of employment," his option to obtain an individual replacement policy expired, _ipso_ _facto_, "thirty-one days after such termination [of employment.]" Decedent's termination of employment, by his own election, was effective May 13, 1994. As May has thirty-one days, June 13 was the last day of the thirty-one day period following the day on which Decedent's employment at St. Paul ended. Indeed, as the Policy afforded Decedent continued coverage of thirty-one days following his regular coverage, which extended until May 31, the Policy's continuation was longer than required under paragraph (10).

Not only did Decedent fail to submit an application and first premium for such successor individual coverage by or before either June 13 or July 1, the record is devoid of probative evidence that he planned to obtain conversion coverage at any time. On the contrary, his obtaining $100,000 in group life coverage under his new employer's plan is strong circumstantial evidence that if Decedent, an experienced insurance professional, ever thought about acquiring the more expensive coverage that a conversion policy would have provided, he dropped that thought when he opted for the new group coverage. We conclude that paragraph (10) of § 176 gains Robin nothing.

And, finally, paragraph (12) of § 176 is equally unavailing under the instant sequence of events. Even though Decedent never applied for a conversion policy between his May 13 departure from

13

St. Paul and his death on July 3, the mandatory group policy provision of paragraph (12) would have entitled Robin to collect the proceeds of Decedent's coverage under the Policy if he had died "during the period within which he would have been entitled to have an individual policy issued to him in accordance with paragraph[](10). . . ." We have already demonstrated that June 13, 1994, was the last day of "the period within which he would have been entitled to have an individual policy issued to him. . . ." Because Decedent did not die between May 13 and June 13, 1994, entitlement to death benefits pending conversion, as required by paragraph (12), never eventuated. As in the case of paragraph (9), even if, by some wild stretch of interpretation, the conversion period of paragraph (12) were construed to be thirty-one days following May 31 instead of May 13, Robin would still gain nothing because Decedent was alive on and after July 1, 1994, the thirty-first day following the last day of May. Thus, for purposes of paragraph (12), Decedent lived beyond the time when he was entitled to obtain an individual policy and thus outlived the coverage mandated by that paragraph.

If, in the alternative, we were to review and reverse the district court and hold that ERISA does preempt Robin's claim under La. Rev. Stat. Ann. § 22:176, she still would take nothing under the Policy. Under such an alternative, we would conclude that MetLife's interpretation of the law and the relevant provisions of the Policy, and its application of the facts thereto, were correct

14

and thus in no way constituted an abuse of the discretion vested in MetLife. The foregoing analysis of Robin's claim under the Louisiana statute would serve to exonerate MetLife from Robin's charge of abuse of discretion. MetLife's determinations, free of the strictures of the Louisiana statute and based instead on the facts furnished to it by St. Paul, DCA, and Robin, and on the terms of the St. Paul Plan as set forth in the SPD and the terms of the Policy, would pass the two-step test of <u>Wildbur v. ARCO Chemical Co.</u> with flying colors.[15] That leaves only Robin's estoppel claim, to which we now turn.

D.   <u>Estoppel</u>

Conveniently disregarding the interrelationships (or lack thereof) among St. Paul, DCA, and MetLife,[16] Robin grounds her estoppel claim in the contention that the continuation and conversion notice furnished to Decedent —— <u>by</u> DCA, not by MetLife —— misled him into thinking that Minnesota law gave him the right

---

[15]974 F.2d 631, 637-38 (5th Cir. 1992).

[16]Again, Decedent's employer until May 13, 1994, was St. Paul, which sponsored a package of ERISA plans for the benefit of its participating employees, one of which plans was group life insurance provided by the Policy. The Policy itself, issued by MetLife, is a plan governed by ERISA. None contest that this plan vests MetLife with the maximum degree of discretion permitted under ERISA for interpreting the plan and determining entitlement to benefits. In contrast, DCA contracts with St. Paul —— not with MetLife, with which DCA has no relationship whatsoever —— to administer COBRA and other obligations of St. Paul to former employees after termination of their employment. Among the administrative functions that DCA performs <u>for St. Paul</u> relative to such terminated employees is the furnishing of notifications regarding continuation and conversion of group life insurance.

15

to elect eighteen months of continued group life coverage under the Policy or a protracted period to convert to an individual Policy. Even though the summary judgment record contains nothing resembling probative evidence of Decedent's reliance —— detrimental or otherwise —— on the admittedly wrong notice that DCA sent to him, or that Decedent had any contemplation of taking action to continue or convert in accordance with that notice, one thing is clear: Any such state law estoppel claim could only be asserted against St. Paul (by virtue of retaining DCA as its agent) or DCA (for its own error in sending Decedent the notice intended for Minnesota residents, without including in the notice the information that it was applicable to Minnesota residents only).[17] No such claim could be asserted against MetLife, which had neither a legal nor a factual nexus with the erroneous notice or its issuer, DCA. Any vicarious tarring of St. Paul with DCA's brush cannot reach MetLife, no matter how broad that agency brush might be.[18]

We are satisfied that MetLife's denial of Robin's estoppel claim as well as all of her ERISA claims was correctly approbated by the district court, given the operable facts of this case and the provisions of the St. Paul Plan and the Policy. Nothing in MetLife's interpretation of the applicable provisions or its denial

---

[17]As Robin has settled with St. Paul and DCA, her estoppel claim against those defendants is not before us.

[18]This disposition of Robin's estoppel claim obviates the need to address ERISA preemption in this context, even though the district court found preemption under 29 U.S.C. § 1144(a).

16

of Robin's claims approaches abuse of discretion.

III

CONCLUSION

After reviewing the summary judgment record in this case, the reasoning of the district court, and the arguments and citations of counsel as set forth in their appellate briefs and in their oral arguments to this court, we remain convinced —— for the reasons expressed above —— that the summary judgments of the district court are free of reversible error and must, therefore, be AFFIRMED, at appellant's cost.