REVISED MARCH 1, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10585
_____


MICHAEL JAY McNEIL, ET AL.,

                                              Plaintiffs,

JIMMY WALLACE McNEIL, as
Independent Executor and
Representative of the
Estate of Michael Jay McNeil,

                                    Plaintiff-Appellant,

                          versus

TIME INSURANCE COMPANY,

                                    Defendant-Appellee.
_____

Appeal from the United States District Court for the
Northern District of Texas
_____
February 24,2000
Before REYNALDO G. GARZA, JOLLY, and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:


     In this case, we are presented difficult questions of

statutory interpretation that determine whether the defendant

insurance company is liable for more than $400,000 in hospital

bills, which the insured, now deceased, incurred as a result of his

losing battle with AIDS.  In addition to state statutory questions,

we must decide whether the Americans with Disabilities Act's

("ADA") anti-discrimination provisions regulate the terms and content of an insurance policy. We ultimately decide that the ADA does not regulate the terms or content of goods and services, of which this insurance policy is one. We therefore affirm the district court's grant of summary judgment dismissing the complaint.

I

In the spring of 1994, Dr. Michael McNeil, a Texas optometrist, did not know that he would be dead within the year because of AIDS. He thus routinely sought to cover himself and his employee in his optometry practice under a general health insurance plan.

Dr. McNeil's optometry practice was a two-person partnership with Dr. Roy F. Dickey. The partnership had one employee, its secretary, Jana Jay. The partnership was a member of the Texas Optometric Association, which operated as a trust, allowing its members to purchase group insurance. In April, Dr. McNeil received information about a new life and health insurance policy offered by Time Insurance Company through the association. The brochure described the policy's benefits and costs. The policy contained no limitation on pre-existing conditions and provided lifetime maximum benefits of $2 million. There were limitations on coverage for several specific health problems. One of these was for Acquired

2

Immune Deficiency Syndrome ("AIDS"). The policy limited coverage for AIDS and AIDS Related Complex ("ARC") to $10,000 during the first two years of the policy but provided maximum benefits after that.

Dr. McNeil decided that the partnership should purchase this plan. He filled out the employer application, signing a document indicating that he had "authority to bind the employer," and then he and Ms. Jay mailed employee enrollment forms to Time. His form listed him as an "employee." Dr. Dickey was covered by Medicare and did not enroll. The partnership paid the first premium to Time for Dr. McNeil and Ms. Jay from its operating account, though Dr. McNeil later reimbursed the partnership for his portion. The plan became effective on May 1, 1994.

After the plan became effective, Dr. McNeil paid his own premiums, while the partnership paid for Ms. Jay's. During the plan's operation, the partnership's administrative duties consisted of receiving premium notices and paying Ms. Jay's premiums.

In September 1994, Dr. McNeil was diagnosed with AIDS. He was admitted to the hospital and treated for pneumonia. Time paid the first $10,000 of his costs but nothing more. Dr. McNeil subsequently incurred over $400,000 in medical expenses. He died on March 1, 1995.

3

Before his death, Dr. McNeil brought suit in Texas state court. After Dr. McNeil's death, his father and the executor of his estate took over the suit. Time later removed the case to federal court based on ERISA preemption and diversity. Mr. McNeil then amended the complaint several times. The last version, the Third Amended Complaint, asserted several common law causes of action: breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, common law discrimination, waiver, estoppel, and ratification. This amended complaint also charged that Time had violated a host of state and federal statutes, including the Texas Deceptive Trade Practices Act ("DTPA"), the Texas Insurance Code, the Texas Commission on Human Rights Act ("TCHRA"), the Americans with Disabilities Act ("ADA"), and ERISA.

Mr. McNeil did not have much success in federal district court. First, the court dismissed the claims that were based on alleged violation of Texas insurance law. Second, the court held that Time's provision of insurance did not constitute a "public accommodation" under the ADA, and that Title III of that Act only applied to physical use of the services of a place of public accommodation. Since Mr. McNeil could point to nothing that prevented his son from making physical use of Time's services, the court dismissed the ADA claim. Third, the court held that ERISA

4

preempted the remaining state law claims.  Mr. McNeil now appeals

each of these three determinations.

II

A

We first address the district court's dismissal of Mr.

McNeil's claim under Article 21.21-3 of the Texas Insurance Code:[1]

> Art. 21.21-3. Discrimination Against Handicapped
> Prohibited
>
> An <u>insurer</u> who delivers or issues for delivery or renews
> any insurance in this state <u>may not</u> refuse to insure,
> refuse to continue to insure, <u>limit the amount, extent,
> or kind of coverage</u> available <u>to an individual</u>, or charge
> an individual a different rate for the same coverage
> solely <u>because of handicap or partial handicap</u>, except
> where the refusal, limitation, or rate differential is
> based on sound actuarial principles or is related to
> actual or reasonably anticipated experience.

(Emphasis added).  The district court first concluded that AIDS was

not a "handicap" for purposes of this statute.  The court

---

[1]This provision was repealed in 1993 and was replaced by Tex.
Ins. Code Ann. art. 21.21-6 (Vernon Supp. 1977).  When enacting
Article 21.21-6, the Texas legislature provided that "[t]his Act
takes effect September 1, 1995, and applies only to an insurance
policy or an evidence of coverage that is delivered, issued for
delivery, or renewed on or after January 1, 1996.  A policy or
evidence of coverage that is delivered, issued for delivery, or
renewed before January 1, 1996 is governed by the law as it existed
immediately before the effective date of this Act, and that law is
continued in effect for that purpose."  <u>Id.</u> (Historical and
Statutory Notes).  Because Dr. McNeil obtained his coverage before
January 1, 1996, Article 21.21-3 provides the basis for his claim.
    We also note that because the district court dismissed this
particular cause of action, it did not rule on whether ERISA
preempted this claim.  Our subsequent discussion of ERISA
preemption, therefore, does not involve Article 21.21-3.

acknowledged that although the statute did not define "handicap," the Texas Commission on Human Rights Act ("TCHRA") did,[2] and the two statutes were similar enough to warrant reliance on the TCHRA's definition. The district court then cited our holding in Hilton v. Southwestern Bell Telephone Co., 936 F.2d 823, 828 (5th Cir. 1991), for the proposition that AIDS was not a handicap under the TCHRA and thus not a handicap under Article 21.21-3. The court went on to explain that Time's actions did not constitute "discrimination" under Article 21.21-3 because Time inserted the AIDS limitation in all its policies regardless of whether the insured had AIDS. For these reasons, the district court dismissed this portion of Mr. McNeil's complaint for failure to state a claim.

Our analysis of this Texas law begins with statutory construction, a process we approach as a Texas court would. General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 950 (5th Cir. 1991). In Texas, the cardinal rule of statutory construction is to ascertain the "legislature's intent," and to give effect to that intent. Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280 (Tex. 1994). The duty of the court is

---

[2]See Tex.Rev.Civ.Stat.Ann. art. 5221k § 2.01(7)(B) (Vernon 1987)(repealed 1993)(defining "handicap" as "a condition either mental or physical that includes mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services.").

to construe a statute as written and ascertain the legislature's intent from the language of the act. <u>Morrison v. Chan</u>, 699 S.W.2d 205, 208 (Tex. 1985).

In condensed form and for purposes of the case before us, we read this statute as follows: An insurer who issues a policy may not limit the amount or extent of coverage to an individual solely because of handicap.[3] This reading leaves us with these questions. First, is AIDS a handicap for purposes of this statute, and, second, if AIDS is a handicap, did Time, the insurer, limit the amount or extent of the policy's coverage to the individual, Dr. McNeil, because of handicap?

We touch on the first question only briefly because the lack of clarity in Texas law makes us reluctant to say whether AIDS constitutes a handicap under the law of that state. The statute itself does not define the term "handicap," and there are no Texas administrative regulations we comfortably can rely on. We do note that the district court's analysis is not irrefutable. If we are to read and consider various statutes of a common purpose together, <u>Calvert v. Fort Worth National Bank</u>, 356 S.W.2d 918, 921 (Tex. 1962); <u>Cadle Co. v. Butler</u>, 951 S.W.2d 901, 907 (Tex. App. 1997),

---

[3]We have omitted the possible defense, an actuarial basis or past experience, from this reformulation of the provision because Time has apparently conceded that it has no such defense in this case.

7

we cannot stop, as the district court did, with the TCHRA. Administrative regulations interpreting Articles 21.20 and 21.21 do suggest that AIDS is a handicap and must also be considered.[4]  For the sake of this appeal only, however, we will assume that AIDS is a handicap for purposes of Article 21.21-3.

Even so, Time did not violate Article 21.21-3, either at the time that it issued the policy or when it refused to pay more than $10,000 in health care costs.

We begin with the issuance of the policy to Dr. McNeil.  It is true that the policy limited its coverage for AIDS to $10,000 during the first two years of the policy.  The statute, however, focuses on the conduct of the <u>insurer</u>.  The phrase "<u>because</u> of handicap" indicates that the insurer must know that the applicant is handicapped and that the insurer limits coverage to that individual for that reason.[5]  Dr. McNeil was not handicapped when

---

[4]The Texas Board of Insurance promulgated these regulations pursuant to Article 21.21 § 13(a).  But the applicability of the Board's regulations was statutorily limited to interpretations of Articles 21.20 and 21.21, which are different articles than Article 21.21-3.  <u>See</u> Tex.Rev.Civ.Stat.Ann. art. 2226 (treating 21.21 and 21.21-2 as separate articles); <u>Vail v. Texas Farm Bureau Mutual Ins. Co.</u>, 754 S.W.2d 129, 134 (Tex. 1988)(same).

[5]We cannot read "limit the amount or extent of coverage *because of* handicap" as "limit the amount or extent of coverage *for* handicap."  First, "because of" and "for" clearly have different meanings.  Second, that interpretation would raise vexatious questions for courts whenever they faced any limitation in a policy.  Such a construction would require insurers to have an actuarial basis or past experience in support of every limitation

8

Time issued this policy to him, or, at the least, Time did not know that he was. Thus, the limitation by the insurer could not have been "because of handicap."

But even if Time had known this when it sold Dr. McNeil the policy, we do not believe it would change our result. The statute specifies that the insurer may not limit the amount or extent of coverage available "to an individual." In short, the statute prevents an insurer from discriminating against an individual applicant because of handicap. Time offered this general policy without distinguishing between individual applicants based on whether they had AIDS. As long as Time offered Dr. McNeil the same policy it offered everyone else, Time has not violated Article 21.21-3, even assuming it knew that he had AIDS.

After Dr. McNeil was diagnosed with AIDS, Time refused to pay for anything above the $10,000 limit. But this refusal does not mean that the insurer limited the amount of coverage available solely because of handicap. Under the policy, $10,000 was all that was available for AIDS; the insurer simply applied the terms of the policy. The insurance policy itself controlled and determined the

---

on coverage for anything that could be construed as a handicap. Had the legislature intended such a drastic change in the legal requirements on the way insurers do business, we assume that it would have made that intent clearer.

benefits.[6]   But under the plain language of the statute, the violation must be committed by the insurer, not by a term of the policy.   We thus conclude that Time did not violate Article 21.21-3, that is, limit the amount of coverage solely because of handicap, because it was merely applying a term of the policy.

We think this result, closely tied as it is to the actual words in Article 21.21-3, best accords with the legislature's intent.  The title of Article 21.21-3 refers to "discrimination." But there was no discrimination here.  Time offered Dr. McNeil the same policy on the same terms that it offered everyone else.  It did not treat him differently because he was handicapped, which is what we understand "discrimination" to mean.   We conclude, therefore, that Time's policy did not violate Article 21.21-3.

---

[6]This policy specified:

Covered Charges Incurred for treatment of AIDS, AIDS Related Complex (ARC), Human Immunodeficiency Virus (HIV) associated diseases and related immunodeficiency disorders as follows:
a.  Benefits will not be paid for Covered Charges Incurred during the first 12-month period after the Covered Person's Effective Date;
b.  The maximum amount We will pay for Covered Charges Incurred during the second 12-month period after the Covered Person's Effective Date is limited to $10,000; and
c.  Thereafter, benefits will be paid on the same basis as any other illness.

10

Mr. McNeil also charged Time with violation of Article 21.21, specifically, § 4(7)(b), in his summary judgment motion. Although the district court failed to address this claim, we will resolve it on appeal for the sake of efficiency, rather than remanding. See NL Industries, Inc. v. GHR Energy Corp., 940 F.2d 957, 967 (5th Cir. 1991)(reviewing claim not addressed in district court because it would "undoubtedly reappear following remand").

It is quickly apparent that Mr. McNeil does not have a claim under this provision either. Article 21.21 § 1(a) prohibits all unfair and deceptive practices and acts by insurers. Subsequent sections of that article then define what constitutes such an act or practice. In 1994, Article 21.21 § 4(7)(b)[7] defined "unfair discrimination" as:

> Making or permitting any unfair discrimination <u>between individuals of the same class and of essentially the same hazard</u> in the amount of premium, policy fees, or rates charged for any policy or contract of accident or health insurance or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.

(Emphasis added). Mr. McNeil does not attempt to define the class to which his son belonged at the time the insurer issued the policy. He has not alleged that other individuals of any defined

---

[7]This provision was repealed in 1995. See Acts 1995, 74th Leg., ch. 414 § 11, eff. Sept. 1, 1995.

class were charged rates or provided benefits different from those charged and provided to Dr. McNeil.  Indeed, he does not even mention other insureds or potential insureds.  Thus, Mr. McNeil has failed to state a claim under this section of Article 21.21.

III

A

We next turn to Mr. McNeil's claim that Time's policy violated Title III of the ADA.  The relevant portion of Title III reads:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182.  The district court construed this statute to prohibit limitations on physical access to places of public accommodation, and dismissed the claim on summary judgment because Mr. McNeil had not been denied physical access to such a place.

On appeal, Mr. McNeil argues that any limitation on enjoyment of the goods and services of a place of public accommodation violates the statute.  He urges us to read the statute expansively in the light of the purpose of the statute and administrative regulations interpreting it.  Time, on the other hand, pushes for a narrower reading based on Congress' deference to state insurance law and on the impact of a broad reading on the insurance industry. Specifically, Time proposes that the statute merely regulates

12

access to--not the content of--goods and services.  Time also argues that its policy is not discriminatory under the statute. Both parties acknowledge, as they must, that AIDS is a "handicap" for Title III purposes.  See Bragdon v. Abbott, 524 U.S. 624, 188 S.Ct. 2196, 2204, 1141 L.Ed.2d 540 (1998).

B

We read the statute to say: No owner, operator, lessee, or lessor of a place of public accommodation shall discriminate against an individual by denying him or her, because of handicap, the full and equal enjoyment of the goods and services that the place of public accommodation offers.  We think, therefore, that the question to answer in determining the scope of Title III in this case is concise: What does it mean to be discriminated against in the full and equal enjoyment of the goods and services of a place of public accommodation?  We believe that Title III prohibits the owner, operator, lessee, or lessor from denying the disabled access to, or interfering with their enjoyment of, the goods and services of a place of public accommodation.  Title III does not, however, regulate the content of goods and services that are offered.  We reach this conclusion based on the language in the statute and on a practical application of that language.[8]

---

[8]Because we reach our conclusion based on the plain language of the statute, we need not consider the administrative regulations interpreting the ADA.  Any attempt to rely on those regulations,

13

To be sure, we think that the plain language of the statute demonstrates that a business is not required to alter or modify the goods or services it offers to satisfy Title III.[9] The prohibition of the statute is directed against owners, etc., of places of public accommodation.  It prohibits them from discriminating against the disabled.  The discrimination prohibited is that the owner, etc., may not deny the disabled <u>the full and equal enjoyment</u> of the business's goods and services.  Practically speaking, how can an owner, etc., deny the full and equal enjoyment of the goods or services that he offers?  By denying access to, or otherwise interfering with, the use of the goods or services that the

---

moreover, would be fruitless because they are internally contradictory on this specific issue.  <u>Compare</u> <u>DOJ Technical Assistance Manual</u>, § III-3.11000, reprinted in <u>Americans with Disabilities Act Manual</u> (BNA) at 90:0917 (interpreting Title III to regulate the content of insurance policies); with 28 C.F.R. pt. 36, app. B, at 640 (1997)(limiting Title III to access, not the makeup of goods and services offered).

[9]Mr. McNeil contends that our reading renders other portions of Title III superfluous, including §§ 12182(b)(1)(A)(i)-(iii), 12182(b)(2)(A)(ii), and 12188(a)(2). We disagree.  The provisions in §§ 12182(b)(1)(A)(i)-(iii) concerning the opportunity to benefit from or to participate in a good or service do not imply that the goods or services must be modified to ensure that opportunity or benefit.  Rather, this section only refers to impediments that stand in the way of a person's ability to enjoy that good or service in the form that the establishment normally provides it. Similarly, in § 12182(b)(2)(A)(ii), eligibility criteria have nothing to do with the content of a good or service, only to non-physical access to those goods and services.  Finally, § 12188(a)(2) concerns modification of policies by a place of public accommodation, not the modification of insurance policies.

14

business offers. The goods and services that the business offers exist a priori and independently from any discrimination. Stated differently, the goods and services referred to in the statute are simply those that the business normally offers.[10]

We acknowledge that it is literally possible, though strained, to construe "full and equal enjoyment" to suggest that the disabled must be able to enjoy every good and service offered to the same and identical extent as those who are not disabled. Construed in this manner, the statute would regulate the content and type of goods and services. That would be necessary to ensure that the disabled's enjoyment of goods and services offered by the place of public accommodation would be no less than, or different from, that

---

[10]Mr. McNeil has argued that Title III regulates the content of goods and services based on the safe harbor provision for the insurance industry. See 42 U.S.C. § 12201(c). That provision prohibits us from construing Title III to regulate the way insurance companies underwrite, classify, or administer risks when the companies do so consistently with state law. According to Mr. McNeil, this provision that excludes regulation of the content of such policies demonstrates that Title III otherwise applies to the content of insurance policies. We cannot agree, however, that the existence of the "safe harbor" counsels a construction different from the one we reach. We would then have to read Title III as regulating the content of all goods and services, which would lead to the absurd results that we discuss in the main body of our decision. The presence of this provision merely suggests that insurers saw the potential for the construction that Mr. McNeil proposes and obtained special wording from Congress that partially exempted them. Moreover, it would be oxymoronic to interpret the "safe harbor" for the insurance industry as ensuring more regulation of that same industry.

15

of the non-disabled.  But such a reading is plainly unrealistic, and surely unintended, because it makes an unattainable demand.

The unvarnished and sober truth is that in many, if not most, cases, the disabled simply will not have the capacity or ability to enjoy the goods and services of an establishment "fully" and "equally" compared to the non-disabled.  The blind may surely enjoy attending a movie or even a tennis match.  But it seems indisputable that the blind will not fully and equally enjoy the "good" or "service" of those places of public accommodation when visual elements of that experience are, by circumstance, denied them.  Similarly, the deaf sometimes enjoy symphonies because they can sense the vibrations of the music.  But their enjoyment cannot be full or equal compared to one with hearing, because they are not privy to the full range of sounds that one with hearing is.  It is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible.

Furthermore, were we to try to construe the statute in this manner, its application would force impracticable results.  If the blind must be able to enjoy all goods and services to the same extent as the sighted, bookstores would be forced to limit the selection of books they carried because they would need to stock braille versions of every book.  Shoe stores would reduce the styles available to their general customers, because they would

16

need to offer special shoes for people with disabling foot deformities in every style sold to the non-disabled. Sporting goods stores might have to close altogether. Restaurants would have to limit their menus to avoid discriminating against diabetics. After all, to offer food to the public that a diabetic could not eat would, in the literal words of the statute, deny the diabetic the full and equal enjoyment of the goods of the restaurant compared to those with no limitation on their diets.

By citing such examples, we do not mean to make the statute sound ridiculous. We do this to illustrate that the language of the statute can only reasonably be interpreted to have some practical, common sense boundaries. And if we construe Title III to regulate the content of goods and services, there seem to be no statutory boundaries. Based on the language of the statute, we simply see no non-arbitrary way to distinguish regulating the content of some goods from regulating the content of all goods.

In sum, we read Title III to prohibit an owner, etc., of a place of public accommodation from denying the disabled access to the good or service and from interfering with the disableds' full and equal enjoyment of the goods and services offered. But the owner, etc., need not modify or alter the goods and services that it offers in order to avoid violating Title III.

17

We believe our construction gives Title III a broad sweep without overreaching congressional intent and with due regard to the practicalities of applying this mutable statute.[11]  This construction assures that the disabled have access to all goods and services offered by the business and the opportunity to use and enjoy that good or service without interference by the owner, etc. Our opinion merely declines to dictate to every business in the country what types of goods and services must be offered.

We note that our construction accords with those given the statute by most of our sister circuits that have considered the question.  The Third and Sixth Circuits thought that limiting Title III to access as opposed to content was too obvious to warrant additional analysis.[12]  The Seventh Circuit also reached the same conclusion, albeit after a more detailed explanation of the practical difficulties of implementing a contrary reading.[13]  On the

---

[11]42 U.S.C. § 12101(b), from Title III, reads: "It is the purpose of this chapter . . . to invoke the sweep of congressional authority . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities."

[12]See Ford v. Schering-Plough Corp., 145 F.3d 601, 613 (3d Cir. 1998)(insurance policy limiting coverage for mental disabilities did not violate Title III); Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1012 (6th Cir. 1997)(concluding that Title III does not regulate the content of goods and services).

[13]See Doe v. Mutual of Omaha Ins. Co., 179 F.3d 557, 559-63 (7th Cir. 1999), cert. denied, 120 S.Ct. 845 (2000)(insurance policy with cap on AIDS coverage did not violate Title III).

18

other hand, the Second Circuit read Title III to regulate content as well as access,[14] a reading that we ultimately find unpersuasive for the reasons noted above.[15]

C

It follows from our construction of the statute that Time has not violated Title III by offering a policy that limits the amount of coverage for AIDS to $10,000 over the first two years of the policy. The "good" in this case is the insurance policy that Time offered to the members of the Texas Optometric Association. To establish a Title III violation, Mr. McNeil is required to demonstrate that Time denied his son access to that good or interfered with his son's enjoyment of it. Mr. McNeil concedes that Time offered the policy to his son on the same terms as it offered the policy to other members of the association; that is, his son had non-discriminatory access to the good. Mr. McNeil has not alleged that Time interfered with his son's ability to enjoy

---

[14]See Pallozzi v. Allstate Life Ins. Co., 1999 WL 1079973 at *3-6 (2d Cir. 1999)(refusal to sell life insurance to one with a mental disorder violated Title III).

[15]The Second Circuit reasoned that the content of goods and services would need to be altered to allow the disabled the opportunity to fully and equally enjoy those goods and services along with the non-disabled. As already noted, we think such full and equal enjoyment is neither possible nor practicable. In addition, the court relied on the presence of the "safe harbor" provision in Title III for insurers. We address this argument in footnote 11, supra.

that policy as it was written and offered to the non-disabled public.[16]  Instead, Mr. McNeil's Title III challenge is to a particular provision of the policy--the AIDS limitation.  He is, in effect, challenging the content of the good that Time offered. Because Title III does not reach so far as to regulate the content of goods and services, and because it is undisputed this limitation for AIDS is part of the content of the good that Time offered, Mr. McNeil's Title III claim must fail.

We therefore affirm the district court's dismissal of Mr. McNeil's Title III claim.

IV

The district court held that ERISA preempted Mr. McNeil's remaining state law claims and dismissed them.  In doing so, the court first determined that Time's policy constituted an ERISA plan, and that the state law claims did not fall within ERISA's safe harbor for the operation of laws regulating insurance.  Mr. McNeil takes issue with each of these determinations on appeal.

It is well established that state law claims are preempted if they "relate to" an ERISA plan.  ERISA's preemption clause states that ERISA "shall supersede any and all State laws insofar as they

---

[16]Although Mr. McNeil may argue that his son was denied access to a service when Time failed to pay the claims beyond $10,000, this is still an attack on the content of the good.  The policy did not provide for payment of claims beyond $10,000, so their payment was not a service that Dr. McNeil was entitled to.

may now or hereafter relate to any employer benefit plan." 29 U.S.C. § 1144(a) (expressly excepting two situations not applicable here).

In reviewing the district court's decision, we must make two separate determinations. First, we need to establish that Time's insurance policy constituted an ERISA plan. This is an issue of fact that we review for clear error. Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 (9th Cir. 1998); Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995). Second, if there is such a plan, we must establish that ERISA does preempt Mr. McNeil's state law claims. This is an issue of law that we review de novo. Robin v. Metropolitan Life Insurance Co., 147 F.3d 440, 444 (5th Cir. 1998).

A

Under ERISA, an "employee welfare benefit plan" is defined, in part, as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1). To determine whether a particular plan qualifies as an ERISA plan, we ask whether the plan (1) exists; (2) falls within the safe harbor exclusion established by the Department of Labor; and (3) meets the ERISA requirement of

21

establishment or maintenance by an employer for the purpose of benefitting the plan participants.  <u>Meredith v. Time Ins. Co.</u>, 980 F.2d 352, 355 (5th Cir. 1993).

(1)

We agree with the district court that a plan existed.  The district court held that a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.  <u>See</u> <u>id.</u> (setting out the rule for determining the existence of a plan).  This information was clearly available in the brochures Dr. McNeil received.

The plan that existed, moreover, was a single plan covering both Ms. Jay and Dr. McNeil.  Before either obtained coverage, Dr. McNeil filled out an employer application.  Then, both he and Ms. Jay sent in their individual employee enrollment forms.  The partnership then paid the first premium for both of them.  After that, premium bills were sent to the partnership and referred to both Ms. Jay and Dr. McNeil.  All these factors indicate that the plan, at least as established, included Dr. McNeil.  Any concerns we have about the fact that Dr. McNeil usually paid his own premium are not enough to overcome the deference due the district court concerning an issue of fact such as this one.  The court held that

22

there was a single plan that included both Ms. Jay and Dr. McNeil, and we cannot say that determination was clear error.[17]

(2)

To qualify as an ERISA plan, the plan cannot fall within the Department of Labor's "safe harbor" exclusion. ERISA's § 505 granted the Secretary of Labor the authority to promulgate regulations for implementation of ERISA, 29 U.S.C. § 1135,[18] and the Secretary has created an exemption for certain group or group-type insurance programs from the scope of ERISA. 29 C.F.R. § 2510.3-1(j)(1999).[19] We have adopted this "safe harbor" for

---

[17]It is true that a plan in which the only participants are the owners or partners does not constitute an ERISA benefit plan. Meredith v. Time Ins. Co., 980 F.2d 352, 357-58 (5th Cir. 1993). But that is not the case here, because the plan covered both Dr. McNeil and Ms. Jay. See Vega v. Nat. Life Ins. Services, Inc., 188 F.3d 287, 291 (5th Cir. 1999)(en banc)(plan covering owners and employees constituted ERISA plan); Peterson v. American Life & Health Ins. Co., 48 F.3d 404, 408 (9th Cir. 1995)(the involvement of at least one employee is sufficient to establish the existence of an ERISA plan).

[18]29 U.S.C. § 1135 reads:

Subject to subchapter II of this chapter and section 1029 of this title, the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records (subject to section 1134(a) and (b) of this title).

[19]29 C.F.R. § 2510.3-1(j) reads:

certain types of claims, and have held that an insurance policy is not governed by ERISA if (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer; and (4) the employer received no profit from the plan. Meredith, 980 F.2d at 355. The plan must meet all four criteria to be exempt. Id.

Time's plan does not fall within the ERISA safe harbor. As the district court noted, the evidence clearly establishes that the partnership contributed to the plan. Though the partnership's

---

(j) Certain group or group-type insurance programs. For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
(1) No contributions are made by an employer or employee organization;
(2) Participation in the program is completely voluntary for employees or members;
(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

contributions were for Ms. Jay, not Dr. McNeil, all the documents filed with Time indicated that the two were members of the same plan.

(3)

Finally, the plan met the requirements of 29 U.S.C. § 1002(1). First, the single plan was established by the partnership.  Dr. McNeil filed an employer application for the partnership and signed a document purporting to bind the partnership.  In addition, the partnership paid the initial premium establishing the policy.  The bills that Time sent to the partnership, as opposed to each individual, support this conclusion that the partnership established a single plan.  The partnership also maintained that plan by paying Ms. Jay's premiums throughout the life of the partnership.  Second, the purpose of the plan was to provide the participants, Ms. Jay and Dr. McNeil, with medical care.

Mr. McNeil raises one other argument for the proposition that this plan did not constitute an ERISA plan.  He contends that the partnership's involvement in interstate commerce was not sufficient to implicate ERISA under 29 U.S.C. § 1003(a)(1).  We cannot agree. Mr. McNeil concedes that the partnership purchased glasses from other states that were then shipped to the office in Texas. Moreover, because Time was not in Texas, even setting up the insurance policy constituted interstate commerce.  There is no

25

doubt, therefore, that the partnership was involved in interstate commerce, and the extent of that involvement, at least for ERISA purposes, is not a matter of degree.

B

ERISA's preemption of state law claims is extensive. We have held that § 1144(a) preempts a state law claim if that claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan, and if that claim directly affects the relationship between traditional ERISA entities. Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606, 611 (5th Cir. 1999).[20]

Mr. McNeil makes the following state common law claims that have not been addressed on the merits: breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, common law discrimination, waiver, estoppel and ratification. He also argues that various provisions of the Texas

---

[20]We disagree with Mr. McNeil's argument that our inquiry on this issue has been fundamentally altered by the Supreme Court's decision in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The method of analysis we use today was well established before that decision, and it continues to be used today. Compare Weaver v. Employers Underwriters, Inc., 13 F.3d 172, 176 (5th Cir. 1994)(before Travelers); Memorial Hosp. System v. Northbrook Life Ins. Co., 904 F.2d 236, 245 (5th Cir. 1990)(same); with Cypress Fairbanks Medical Center Inc. v. Pan-American Life Ins. Co., 110 F.3d 280, 283 (5th Cir. 1997)(post-Travelers); Smith v. Texas Children's Hospital, 84 F.3d 152, 155 (5th Cir. 1996)(same).

Insurance Code requiring sound actuarial principles have been incorporated into state contract law and tort law (under the duty of good faith and fair dealing) when insurance is involved.[21]

We hold that all of these claims are preempted by ERISA.[22] Each claim addresses Mr. McNeil's right to receive benefits under the terms of an ERISA plan. Moreover, these claims directly affect the relationship between Dr. McNeil's estate and Time. A finding for either party will affect the obligations owed to the other under the provisions of the plan. For these reasons, we hold that the district court's determination of ERISA preemption over the state claims was correct.[23]

There is one exception to ERISA preemption, but it does not apply in this case. Mr. McNeil argues that the laws on which he bases his claims fall within ERISA's "savings clause," 29 U.S.C. § 1144(b)(2)(A). That provision states: "Except as provided in

---

[21]Mr. McNeil also cites to 26 T.A.C. § 26.20(e), 26 T.A.C. § 26.27, and 28 T.A.C. § 21.702, but these are agency regulations and do not provide the foundation for a claim.

[22]Because we have federal diversity and federal question jurisdiction, we do not consider the question of complete preemption. See McClelland v. Gronwaldt, 155 F.3d 507 (5th Cir. 1998).

[23]Mr. McNeil's contentions concerning the incorporation of Texas insurance law's requirement of sound actuarial principles are inherently part of these state law claims. While that requirement might affect resolution of those claims because of incorporation, that does not alter the nature of those claims, and therefore our determination concerning preemption.

subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." Id. A law regulates insurance when: (1) it is specifically directed at the insurance industry; (2) it transfers or spreads policyholder risk; and (3) it affects an integral part of the policy relationship between insurer and insured. Gahn v. Allstate Life Ins., 926 F.2d 1449, 1453 (5th Cir. 1991). Unfortunately for Mr. McNeil, none of the remaining state law claims satisfies these requirements. Thus, these state laws do not fall within the savings clause.

V

For the reasons stated herein, the district court's decision is, in all respects,

A F F I R M E D.