**C. Lynn CROOMS, M.D., Plaintiff**

**v.**

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY,**
**Defendant.**

**No. CIV.A. 104CV3519ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 30, 2007.

Ronald L. Hilley of Hilley & Frieder in Tucker, GA, for the plaintiff.

H. Sanders Carter, Jr. and Aaron E. Pohlmann of Carter & Ansley LLP in Atlanta, GA, for the defendant.

## ORDER

EVANS, District Judge.

This diversity suit for damages alleging breach of several insurance contracts is before the Court on Plaintiff's Motion for Summary Judgment [# 36], Defendant's Motion for Summary Judgment [# 40], Plaintiff's Cross–Motion for Summary Judgment [# 59], and Plaintiff's Motion for Order to Permit Late Filing [# 68].

Plaintiff claims that he was disabled due to an accident that occurred in September 1991 when he was fifty-three years old. Plaintiff claims that because he was disabled by an accident, he is entitled to lifetime benefits under three disability insurance policies issued to him by Defendant. Plaintiff seeks summary judgment on the issues of (1) the source of his disability; (2) that his accident or injury meets the definition of "injury" under his disability insurance policies; and (3) that he continues to be totally disabled. Defendant opposes Plaintiff's motion and argues that Plaintiff was disabled due to sickness and therefore Plaintiff was only entitled to disability benefits until he reached age sixty-five. Plaintiff is now approximately sixty-nine years old. The disability payments ceased in 2003.

Defendant argues in its Motion for Summary Judgment that Plaintiff's state law breach of contract claims are preempted by ERISA because Plaintiff's disability in- surance policies were part of an employee benefits plan and Plaintiff's claims relate to that plan. Alternatively, Defendant argues that Plaintiff is estopped from asserting state law or ERISA claims because Plaintiff failed to timely notify Defendant of the cause of his disability as he was required to do under the insurance contracts.

Plaintiff asserts in his Cross–Motion for Summary Judgment that he is entitled to summary judgment on Defendant's ERISA claims because Plaintiff's disability insurance policies were not part of an employee benefits plan. Alternatively, Plaintiff seeks summary judgment on the issue of waiver and/or estoppel and argues that the doctrines do not apply here.

For the following reasons, Plaintiff's Motion for Summary Judgment [# 36] is DENIED. Defendant's Motion for Summary Judgment [# 40] is GRANTED IN PART, with leave for Plaintiff to amend his complaint to add an ERISA claim. Plaintiff's Cross–Motion for Summary Judgment [# 59] is DENIED. Plaintiff's Motion for Order to Permit Late Filing [# 68] is GRANTED *nunc pro tunc.*

### I. Facts

Unless otherwise indicated, the following facts are undisputed.[1]

### A. Plaintiff's Herniated Cervical Intervertebral Disc

Plaintiff C. Lyn Crooms, M.D. ("Plaintiff") is an orthopedic surgeon licensed to practice in Georgia who in September 1991 was an equal shareholder in and employee of a professional corporation organized for the private practice of orthopedic

---

1. Plaintiff did not attach a separate statement of material facts to its Motion for Summary Judgment [# 36] filed on May 15, 2006, as Plaintiff is required to do by N.D. Ga. Local Rule 56.1(B). On July 6, 2006, Plaintiff filed a Motion to Permit Late Filing of his Statement of Material Facts [# 68]. In his motion, Plaintiff explains that Plaintiff's counsel and Defense counsel have spoken about this omission by Plaintiff and that Defendant does not object to Plaintiff's late filing. The Court hereby GRANTS Plaintiff's motion *nunc pro tunc* and incorporates Plaintiff's alleged facts below.

surgery, Chattahoochee Orthopedic Clinic (now defunct). In September 1991, Plaintiff suffered from a herniated cervical intervertebral disc. According to Plaintiff, the herniated disc was the result of an accident in his bathroom on September 3, 1991. According to Defendant, the herniated disc developed gradually over time due to an underlying progressive, degenerative spinal condition.

Whatever its cause, the herniated disc caused Plaintiff to feel a sharp pain in his neck and down his left arm. Between September 3, 1991 and December 19, 1991, Plaintiff continued to practice orthopedic surgery. However, the pain resulting from the herniated disc made Plaintiff's practice of orthopedic surgery increasingly difficult. Plaintiff tried various non-surgical methods to remedy the pain, but none were entirely successful.

On December 30, 1991, Plaintiff underwent the first of two surgeries on the herniated disk. The surgery was performed by orthopedic surgeon Dr. Newton Clark at Northside Hospital in Atlanta, Georgia. After the surgery, Plaintiff's pain persisted. Dr. Henry H. Bohlman performed a second surgery on Plaintiff's spine on January 23, 1992, in Cleveland, Ohio. Although Plaintiff had anticipated returning to work full-time after his surgeries, Plaintiff only returned to work part-time following the surgeries on his spine. Plaintiff never again performed orthopedic surgery after December 19, 1991.

### B. *Plaintiff's Disability Insurance Policies*

Beginning in 1974, Plaintiff obtained several insurance policies from Provident Life and Accident Insurance Company[2] ("Provident," "Defendant") to provide payment of disability income benefits to him in the event of a disabling sickness or injury. Three of those policies and the manner in which they were acquired and maintained are at issue in this case.

#### 1. *Policy Provisions Regarding the Cause of Disability*

All three policies contain provisions distinguishing the disability benefits payable under the policies according to the cause of the disability accident or injury versus sickness.

The first policy, number 6PC–200627 ("1974 policy"), effective October 24, 1974, provided for a monthly benefit of $3,500.00 for Plaintiff's lifetime for total disability due to an accident occurring prior to Plaintiff's sixty-fifth birthday. *See* Crooms Dep., Ex. 16 at 3. The 1974 policy also provided for a monthly benefit of $3,500.00 for total disability due to sickness if the sickness commenced on or after Plaintiff's fiftieth birthday but prior to his sixty-fifth birthday, with benefits to end at age sixty-five. *Id.*

The second policy, policy number 6PC–469950 ("1981 policy"), effective May 1, 1981, provided for a monthly benefit of $1,500.00 for Plaintiff's lifetime for total disability due to an accident occurring prior to Plaintiff's sixty-fifth birthday. *See*

**2.** After Plaintiff obtained his disability insurance policies but before this dispute arose, Provident Life and Accident Insurance Company merged with UNUM Corporation to create UnumProvident Corporation. Plaintiff initially named UnumProvident as the defendant in this action. However, the Court granted Plaintiff's motion to drop UnumProvident as defendant and add Provident as defendant. As stated by the Court in the Consent Order Adding and Dropping Parties [# 12], the parties agree that UnumProvident is merely a holding company that does not issue insurance policies. Any UnumProvident employees deposed or called as witnesses in this action were acting on behalf of Provident in reviewing Plaintiff's claim and in making any claim decisions.

Crooms Dep., Ex. 17 at 3. The 1981 policy also provided for a monthly benefit of $1,500.00 for total disability due to sickness if the sickness commenced on or after Plaintiff's fiftieth birthday but prior to his sixty-fifth birthday, with benefits to end at age sixty-five. *Id.*

The third policy, policy number 6-334-552205 ("1983 policy"), effective February 1, 1983, provided for a monthly benefit of $3,800.00 for Plaintiff's lifetime for total disability due to an injury occurring prior to Plaintiff's sixty-fifth birthday. *See* Crooms Dep., Ex. 18 at 3. The 1983 policy also provided for a monthly benefit of $3,800.00 for total disability due to sickness if the sickness commenced on or after Plaintiff's fiftieth birthday but prior to his sixty-fifth birthday, with benefits to end at age sixty-five. *Id.*

### 2. *The Manner in which Plaintiff Obtained the Policies*

Plaintiff joined Dr. Harry L. Broome in private practice and as an equal shareholder in Chattahoochee Orthopedic Clinic, P.C., in 1973. Chattahoochee Orthopedic Clinic was a Georgia professional corporation. From 1973 until it closed its doors in 1996, Plaintiff and Dr. Broome were the only physicians working at Chattahoochee Orthopedic Clinic. Neither Plaintiff nor Dr. Broome ever practiced medicine in any state other than Georgia. All of Chattahoochee Orthopedic Clinic's employees resided in Georgia. Plaintiff and Dr. Broome were responsible for all management decisions at Chattahoochee Orthopedic Clinic. Plaintiff was the decisionmaker regarding the Clinic's insurance coverage for its employees. *See* Broome Dep. at 13–16.

When Plaintiff submitted an application to Defendant for the 1974 disability insurance policy, Plaintiff did so as an individual. Therefore, the 1974 policy was originally issued to Plaintiff independent of Plaintiff's relationship with Chattahoochee Orthopedic Clinic.

In 1976, Chattahoochee Orthopedic Clinic entered into a "Salary Allotment Agreement" with Defendant in connection with disability insurance policies to be issued to Plaintiff, his partner Dr. Broome, and "Jane Does 1–5." Under that agreement, Chattahoochee Orthopedic Clinic told Defendant it would pay the premiums for its employees' disability insurance policies by deducting the premiums from the employees' salaries. In exchange, Defendant offered Chattahoochee Orthopedic Clinic a lower premium than would normally be required for disability insurance policies. Also in 1976, Defendant issued a Salary Allotment Rider to Plaintiff's 1974 disability insurance policy, under which the 1974 policy became part of the 1976 Salary Allotment Agreement and Defendant agreed it would accept premium payments for Plaintiff's policy from Chattahoochee Orthopedic Clinic.

In 1981, Chattahoochee Orthopedic Clinic entered into another Salary Allotment Agreement with Defendant, under which the Clinic told Defendant it would pay the premiums for each employee's disability insurance policies in full instead of deducting the premiums from the employees' salaries. Plaintiff signed this Salary Allotment Agreement on behalf of Chattahoochee Orthopedic Clinic. Defendant alleges that the 1981 Salary Allotment Agreement superseded the 1976 Salary Allotment Agreement. Plaintiff alleges that the 1981 Agreement did not include any language that stated that it modified or changed any prior agreements between the two parties. Therefore, Plaintiff alleges that the 1981 Agreement and the 1976 Agreement remained separate and merely co-existed. Plaintiff also alleges that there is nothing in the 1981 Agreement prohibiting Chattahoochee Orthope-

dic Clinic from collecting funds from its employees to reimburse the corporation for the premiums it was paying for their disability insurance policies.

Plaintiff applied for and obtained the 1981 Policy around the same time, and indicated on his application that his "employer" would pay his premiums under the policy. Plaintiff executed a Salary Allotment Rider for the 1981 Policy. Defendant alleges that this rider brought Plaintiff's 1981 disability insurance policy under the 1981 Salary Allotment Agreement. Plaintiff alleges that the rider does not refer to either the 1981 or 1976 Salary Allotment Agreements, therefore it is unclear whether the 1981 policy is under the 1981 Agreement of the 1976 Agreement. Defendant states that Chattahoochee Orthopedic paid a ten percent lower premium on Plaintiff's 1981 disability insurance policy as a result of the 1981 Salary Allotment Agreement. Defendant also states that Plaintiff was provided a twenty percent higher monthly disability benefit under this policy as a result of the 1981 Salary Allotment Agreement.

Plaintiff applied for the 1983 Policy in November 1982, while the 1981 Salary Allotment Agreement was in effect between Chattahoochee Orthopedic Clinic and Defendant. The policy included a Salary Allotment Premium provision indicating that Defendant would accept premium payments under the policy from Plaintiff's "employer." Plaintiff also told Defendant that his "employer" would pay the policy premiums. Defendant considered the 1983 Policy to be part of the 1981 Salary Allotment Agreement. Plaintiff alleges that the Salary Allotment Premium Provision in the 1983 Policy referred to a "Salary Allotment Agreement" but did not specify to which agreement it was referring, therefore it is impossible to determine which Agreement applied to the 1983 Policy. Defendant states that Chattahoochee

Orthopedic Clinic received a ten percent lower premium on Plaintiff's 1983 disability insurance policy as a result of this policy being part of the 1981 Salary Allotment Agreement. Defendant also states that Plaintiff was eligible for a significantly higher benefit under the policy because of that Agreement, $3,800.00 per month rather than $2,800.00 per month.

The records regarding the Chattahoochee Orthopedic Clinic's Salary Allotment Agreement are no longer available. However, following execution of that agreement, Defendant provided a single invoice to the Clinic for its employees' disability insurance policies and the Clinic paid the premiums for those policies. Chattahoochee Orthopedic Clinic also corresponded with Defendant regarding the administration of the disability insurance plans held by its employees. Despite this evidence, Plaintiff testifies that he personally paid the premiums for his disability insurance policies. *See* Crooms Dep.

An employee of Chattahoochee Orthopedic Clinic, Sheila Mullins Kelleher, testifies that she personally paid for her policy. *See* Kelleher Dep. at 17–18. Ms. Kelleher testifies that she was offered disability insurance under the following circumstances: "The disability insurance was offered to any employee who wanted disability insurance under the understanding we paid for our disability insurance. The doctors did not cover that." *Id.* at 17, lines 22–25. Ms. Kelleher testifies that the Provident insurance agent came to the office to tell them about the disability insurance: "I think Bob Necessary was the person who handled our Provident. I'm sure he came to the office to tell us, if we so desired, we could pay for this policy." *Id.* at 18, lines 6–9. Ms. Kelleher testifies that the insurance was offered to the Clinic's employees only one time, ostensibly in 1976 when Ms. Kelleher obtained the insurance. *Id.* at

26, lines 7–13. Disability insurance was not available to employees who started working at the Clinic later. *Id.* According to Ms. Kelleher, the money for her disability insurance policy "came out of [her] paycheck," and Chattahoochee Orthopedic Clinic did not reimburse her for the premiums. *Id.* at 18, lines 15–18. Ms. Kelleher also testifies that she did not receive additional salary to pay for the disability insurance. *See id.* at 22.

Dr. Harry Broome, Plaintiff's co-owner in Chattahoochee Orthopedic Clinic, testifies that he too paid his disability insurance premiums personally. Broome Dep. at 29, lines 20–21. Dr. Broome testifies that he has "always had the understanding that [he] was paying for [his disability insurance] with after-tax dollars...that it came off [his] side of the ledger and [he] would be compensated less because of that expense" *Id.* at 31, lines 9–12, 16–18. Dr. Broome testifies that he does not know whether Chattahoochee Orthopedic Clinic provided disability insurance to non-physician employees of the clinic. Broome Dep. at 17, lines 11–22. Dr. Broome also testifies that he does not remember whether an insurance agent ever came to the office to meet with the Clinic's employees to talk about disability insurance. *See id.* at 18.

On June 18, 1991, Plaintiff informed Robert Necessary, the insurance agent through whom he had obtained his disability insurance policies, that he intended to pay the premiums on his 1974, 1981, and 1983 insurance policies "on a personal basis," effective immediately. Dr. Broome wrote an identical letter to Mr. Necessary regarding his disability insurance policies as well. Plaintiff's alleged accident in the bathroom occurred approximately two months after the June 18, 1991, letter.

C. *Plaintiff's Claims Under the Disability Insurance Policies*

In early 1992, Plaintiff submitted a claim to Defendant for coverage under his disability insurance policies. *See* Crooms Dep., Ex. 20. Plaintiff used a Provident Life and Accident Insurance Company of America form entitled "Insured's Statement of Claim" to submit his claim to Defendant. The "Insured's Statement of Claim" form requires the insured to distinguish between "accident claims" and "sickness claims." However, the form does not provide an explanation of what constitutes an accident claim or a sickness claim. The form appears as follows:

| FOR ACCIDENT CLAIMS | Date of accident? ____19____ How and where did it happen?_____ |
| | What injuries resulted from accident? |
| FOR SICKNESS CLAIMS | Date sickness began? ____19____ Nature and details of sickness_____ |

*Id.* at 1.

Plaintiff filled out part of the form himself. Plaintiff provided his name, address, birth date, social security number, employer information, medical history and signature. *See id.* An employee of Plaintiff's at Chattahoochee Orthopedic Clinic, Sheila Mullins Kelleher, completed the portions of the form Plaintiff did not complete for himself. *See* Kelleher Dep. at 55–69. It was Ms. Kelleher who completed the portion of the form that provided Defendant with information about whether Plaintiff's claim was an accident claim or a sickness claim. *Id.* at 55. Ms. Kelleher completed the "FOR SICKNESS CLAIMS" portion of the form, not the "FOR ACCIDENT CLAIMS" portion of the form. In the "FOR SICKNESS CLAIMS" portion of the form, Ms. Kelleher stated that Plaintiff's sickness began in September 1991, and described the nature and details of the sickness as "L arm pain—secondary to cervical disc." Crooms Dep., Ex. 20 at 1.

The disability form contained a section asking Plaintiff whether he had ever suffered from the same or a similar condition

in the past. Plaintiff's form, when submitted, had an "X" next to "no."

The disability form named Dr. Newton Clark as Plaintiff's attending physician for Plaintiff's disability claim. Plaintiff submitted an Attending Physician's Statement for Disability Claim form completed by Dr. Clark with his disability claim. On that form, Dr. Clark indicated that Plaintiff's diagnosis was a herniated intervertebral disc at C6–7. Dr. Clark also indicated that Plaintiff's sickness first occurred in September.

Dr. Clark and Plaintiff had a treatment history prior to 1991. In September 1986, Dr. Clark treated Plaintiff for pain in his neck and extending down his left side, in his left shoulder and left index and long finger. Dr. Clark discovered that Plaintiff was suffering from a herniated C5–6 disc. Plaintiff did not undergo surgery in 1986 and instead resolved his pain through cervical traction and medication.

After receiving the claim form filed by Plaintiff, Defendant acknowledged Plaintiff's claim on February 28, 1992. Defendant paid monthly disability insurance benefits to Plaintiff from 1992 to 2003. According to Defendant, it treated Plaintiff's claim as a sickness claim, because Plaintiff's claim form indicated sickness as the cause of Plaintiff's disability. According to Plaintiff, Ms. Kelleher completed the "FOR SICKNESS CLAIMS" portion of the claim form by mistake and his claim should have been treated as an injury or accident claim from the beginning. Plaintiff asserts that he did not know Defendant considered his disability claim to be a sickness claim until 2003.

Prior to Plaintiff's sixty-fifth birthday on July 2, 2003, Defendant sent Plaintiff a letter notifying him that his disability policies would be terminated as of October 1, 2003, because Plaintiff "[would] have attained [his] 65th birthday and [was] no longer actively employed." Crooms Dep.,

Ex. 23. Plaintiff responded by sending Defendant a letter informing Defendant that his disability was caused by accident or injury instead of sickness and that his benefits should therefore be for life instead of terminating at age sixty-five. *See* Crooms Dep., Ex. 24. Plaintiff obtained counsel in early 2004 then appealed Defendant's termination of his disability benefits through Defendant's internal appeal procedures. *See* Morgan Dep.; Sternbergh Dep. After reviewing Plaintiff's file on appeal, Defendant concluded that Plaintiff's disability was the result of sickness and that Plaintiff's benefits were properly terminated. *See* Morgan Dep. at 33; Sternbergh Dep. at 35. Plaintiff filed the instant action on December 6, 2004.

## II. *Standard of Review*

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a summary judgment motion, the Court must view the evidence in a light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Further, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To prevail in its motion for summary judgment, the moving party must show that the evidence is insufficient to establish an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes a sufficient showing, then the non-moving party "must come forward with 'specific

facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the evidence supporting the non-moving party's claims is insufficient for a jury to return a verdict for the non-moving party, or is "merely colorable" or "not significantly probative," then the moving party is entitled to summary judgment. *Anderson*, 477 at 249, 106 S.Ct. 2505. If, however, reasonable minds could differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a verdict for the non-moving party, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. 2505.

III. *Plaintiff's Motion for Summary Judgment*

Plaintiff asserts that Defendant's termination of his disability insurance benefit payments constitutes breach of the insurance contracts executed between Plaintiff and Defendant because (1) Plaintiff's disability arose out of an injury or accident, not a sickness; (2) Plaintiff's accident or injury meets the definition of "injury" under the disability insurance policies; and (3) Plaintiff continues to be totally disabled. Plaintiff asks that the Court to grant him summary judgment on each of these three issues, which would effectively grant him summary judgment on his breach of contract claims.

A. *Source of Plaintiff's Disability*

The primary premise upon which Plaintiff bases this case, as well as his summary judgment motion, is that the herniated disc which resulted in his disability qualifies as one caused by accident or injury under the disability insurance policies issued to him by Defendant. According to Plaintiff, he suffered a herniated disc on September 3, 1991. Plaintiff alleges that on that day, he stepped out of the shower in his bathroom and was walking across his bathroom to shave when he "threw the towel over [his] shoulder to dry off [his] back." Crooms Dep. at 90–91. While throwing the towel over his shoulder, Plaintiff "stumbled" and "jerked [his] neck" then felt "a severe pain...in [his] [left] trapezius like somebody had stuck a hot poker or an ice pick there." *Id.* at 91.

Plaintiff's insurance agent, his wife, and his coworkers all testify that Plaintiff told them the accident occurred in this way as well. For example, Plaintiff's insurance agent (through whom Plaintiff obtained the disability insurance policies) testifies that he spoke with Plaintiff regarding the cause of his disability and that Plaintiff told him "he was in the bathroom of his residence stepping out of the shower[,] lost his balance[,] and as he attempted to regain his balance injured his neck." Pl.'s Mot. for Summ. J., Necessary Aff. at ¶ 10. Plaintiff's wife Joanne Crooms testifies that she was in the bathroom with Plaintiff when the alleged injury occurred, and remembers Plaintiff telling her he "had this sharp pain coming into [his] neck, like a knife was going into [his] neck." J. Crooms Dep. at 42, line 21. Sheila Mullins Kelleher testifies that Plaintiff told her "he had done something" "in the bathroom" and "he had this sharp pain." Kelleher Dep. at 87, line 24, through 88, line 1. Sheila Mullins Kelleher also testifies that Plaintiff's neck problems manifested themselves suddenly. *Id.* at 92, line 20 through 93, line 9.

However, Defendant argues that Plaintiff's herniated disc was the predictable and gradually-occurring result of a long-term degenerative spinal condition with which Plaintiff was first diagnosed in 1986. Defendant provides testimony and medical records that indicate this was the cause of Plaintiff's disability. For example, Dr. Henry Bohlman, who treated Plaintiff at

the Cleveland Clinic, noted on January 22, 1992, after treating Plaintiff, that:

> The patient first complained of neck pain approximately 5 years ago and the pain was most severe with extension of the neck and this radiated to the left shoulder and arm. The patient stated the pain lasted for a few months, approximately 7 months, before he went skiing and the pain disappeared. A few months prior to this admission the pain *gradually recurred.*

Def.'s Mot. for Summ. J., Ex. 40 (emphasis added).

Dr. Joel W. Saks, an orthopedic surgeon employed by UnumProvident to review insurance claims, reviewed Plaintiff's file and concluded that Plaintiff is suffering from "degenerative disc disease and spondylosis" and that "the disc rupture at C6–7 was the result of chronic and extensive degenerative disease in the cervical spine." Saks Dep. at 39, lines 10–20. Dr. Saks also testifies that it would be "inconsistent with [Plaintiff's medical] records" for Plaintiff's ruptured disc to have occurred suddenly, with an immediate onset of pain, on September 3, 1991, in the way Plaintiff claims it did. *Id.* at 67. Dr. Charles Sternbergh, a neurosurgeon employed by UnumProvident to review insurance claims, reviewed Plaintiff's file and came to a similar conclusion. Dr. Sternbergh testifies that "[Plaintiff's] problem is underlying cervical degenerative disease." Sternbergh Dep. at 35, lines 9–10. Dr. Sternbergh also testifies that Plaintiff's medical records contained no evidence that Plaintiff had told his treating physicians that his herniated disc was due to injury:

> Well, the issue, the issue of injury to, to Dr. Crooms, he has alleged an injury. But try as hard as I could, I can't find evidence that he shared that injury with any of his treating physicians. And Dr. Clark doesn't mention it, Dr. Broome, when he took over care, didn't mention

it. Dr. Bohlman, in that the Cleveland Clinic didn't mention it, or Dr. Bohlman's fellow didn't mention it in his records, so I have no documentation whatsoever of an injury. The–Dr. Crooms' history is totally compatible with a progressive degenerative problem. That's that is documented in the information that Dr. Clark has presented.

*Id.* at 57, lines 10–22.

▉ The Court finds that there is a genuine issue of material fact regarding the cause of Plaintiff's disability. Both parties have provided credible evidence and copious testimony to support their respective arguments about the cause of Plaintiff's herniated disc. Any finding with respect to the cause of Plaintiff's herniated disc would require a credibility determination by the Court, which would be impermissible at this stage in the litigation. The cause of Plaintiff's condition should be determined by the fact-finder at trial. Therefore, the Court DENIES Plaintiff's Motion for Summary Judgment.

**IV.** *Defendant's Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment*

Defendant argues that it is entitled to judgment as a matter of law for two reasons. First, Defendant argues that Plaintiff's state law claims are preempted by § 514(a) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a), because Plaintiff's disability insurance policies are part of a benefits plan governed by ERISA. Second, Defendant argues that Plaintiff's claims are barred by waiver and/or estoppel because Plaintiff failed to provide timely written notice or proof that his disability was due to accident or injury rather than sickness.

After Defendant filed its Motion for Summary Judgment, Plaintiff filed a Cross–Motion for Summary Judgment With Respect to ERISA and Notice of Claim Issues. In this motion, Plaintiff argues that he is entitled to summary judgment on Defendant's ERISA claims and that waiver and/or estoppel do not apply here. Plaintiff argues that ERISA does not apply here and therefore his state law claims are not preempted.

## A. ERISA

■ Congress enacted ERISA, 29 U.S.C. § 1001 *et seq.*, to protect "the interests of participants in employee benefit plans and their beneficiaries...." 29 U.S.C. § 1001. ERISA contains a preemption provision, expressly stating that ERISA preempts any state law claim relating to an employee benefit plan covered by ERISA. 29 U.S.C. § 1144. ERISA thus preempts state common law and contract claims relating to employee benefit plans covered by ERISA. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

Defendant argues that Plaintiff's 1974, 1981 and 1983 disability insurance policies were part of an "employee benefit plan" under ERISA. Further, Defendant argues that Plaintiff's state law claims "relate to" the plan as contemplated by ERISA, therefore they are preempted by ERISA.

Plaintiff argues that his disability insurance policies are not part of an employee welfare benefit plan under ERISA. First, Plaintiff argues that his state law claims are not preempted because neither Plaintiff nor Chattahoochee Orthopedic Clinic were engaged in interstate commerce. Second, Plaintiff argues that his state law claims are not preempted because Plaintiff is an "employer" as defined by ERISA, not an "employee." Third, Plaintiff argues that the plan was not "established or main-

tained" by Chattahoochee Orthopedic Clinic and therefore falls within the Labor Department's regulatory "safe harbor." Fourth, Plaintiff argues that, even if the 1981 and 1983 policies are part of an employee welfare benefit plan under ERISA, his 1974 policy is not. Plaintiff asserts that he is entitled to summary judgment on the ERISA issue.

*1. Whether Plaintiff's Insurance Policies Were Part of an Employee Welfare Benefit Plan Under ERISA*

■ Title I of ERISA, applicable to cases like this one, defines "employee benefit plan" as "any plan, fund, or program which was...established or maintained by an employer...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise...disability...benefits." 29 U.S.C. § 1002(1). The United States Court of Appeals for the Eleventh Circuit has held that there are five requirements for a plan to qualify as an employee benefit plan under ERISA: "(1) a 'plan, fund, or program' (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing...disability...benefits...(5) to participants or their beneficiaries." *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir.1982) (en banc). Whether an ERISA plan exists is a fact question for the Court to determine. *Stern v. Provident Life and Accident Ins. Co.*, 295 F.Supp.2d 1321, 1324 (M.D.Fla. 2003).

■■ With respect to the first requirement, "a 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 1373. It seems clear from the record in the instant case that Chattahoochee

Orthopedic Clinic established at least one, if not two, plans under ERISA when it entered into the 1976 and 1981 Salary Allotment Agreements with Defendant. The intended benefits of the Agreements were the disability payments provided under the disability insurance policies. The class of beneficiaries included Plaintiff, Dr. Broome, and five "Jane Doe" employees, one of whom was Sheila Mullins Kelleher, all of whom obtained disability insurance policies. The face of the 1976 agreement indicates the source of financing for the disability insurance will be Chattahoochee Orthopedic Clinic, which will pay the policy premiums by deducting the premiums from employees' salaries. Likewise, the 1981 Agreement also indicates the source of financing will be Chattahoochee Orthopedic Clinic, which will pay the policy premiums in full rather than deducting them from employees' salaries. In exchange for signing the two Salary Allotment Agreements, Chattahoochee Orthopedic Clinic paid a lower premium on its employees' behalf and the employees were eligible for a higher disability benefit. The procedures for receiving disability benefits were explained in the policies themselves, and the Clinic's employees received copies of the policies.

 The second requirement, that the plan be "established or maintained" by the employer is a disjunctive one. "A showing of either one is sufficient to give rise to ERISA's application." *Cowart v. Metro. Life. Ins. Co.*, 444 F.Supp.2d 1282, 1293 (M.D.Ga.2006). The Eleventh Circuit has suggested seven factors that may be relevant in determining whether an employer has established or maintained the plan: "(1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent." *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1215 (11th Cir.1999); *see also Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1265 (11th Cir.2004). In the instant case, Defendant has submitted evidence that Chattahoochee Orthopedic Clinic "established" a plan under ERISA. The 1976 Salary Allotment Agreement was signed by Plaintiff for "Chattahoochee Orthopedic Clinic, P.C." *See* Def.'s Mot. for Summ. J., Ex. 6. The agreement was between the professional corporation Chattahoochee Orthopedic Clinic and Provident Life and Accident Insurance Company. *See id.* Likewise, the 1981 Salary Allotment Agreement was structured and signed the same way. *See* Def.'s Mot. for Summ. J., Ex. 16. Chattahoochee Orthopedic Clinic received a single annual or semi-annual invoice for all the disability insurance policies under the Salary Allotment Agreement. *See* Def.'s Mot. for Summ. J., Exs. 25, 26, 28, 29, 33, 34, 35. Chattahoochee Orthopedic Clinic paid the invoices. *Id.* Ruth Joyner, a onetime bookkeeper for Chattahoochee Orthopedic Clinic, corresponded with Defendant regarding addition and subtraction of employees from the Clinic's insurance coverage as established by the Salary Allotment Agreement. *See* Def.'s Mot. for Summ. J., Exs. 27, 30, 32.

Requirements three, four and five for the plan to qualify as an employee benefit plan under ERISA are self-evident in this case, as they are in the majority of cases. *See Donovan*, 688 F.2d at 1371 ("Prerequisites (3), (4) and (5) are either self-explanatory or defined by statute."). In the instant case, Chattahoochee Orthopedic Clinic was indisputably (3) an employer, the Salary Allotment Agreement was entered into (4) for the purpose of providing disability benefits, and the Agreement was executed for the benefit of (5) Chattahoo-

chee Orthopedic Clinic's employee-participants.

Plaintiff presents four arguments that this Court should not find that a plan under ERISA existed here, or, in the alternative, if a plan did exist, that the plan did not apply to Plaintiff. The Court will address each of these arguments in turn.

First, Plaintiff argues that Chattahoochee Orthopedic Clinic does not qualify as an "employer" under ERISA because the Clinic was not engaged in interstate commerce. Plaintiff derives this argument from 29 U.S.C. § 1003(a)(1), which states that ERISA applies to employee welfare benefit plans that are "established or maintained ... by any employer engaged in commerce or in any industry or activity affecting commerce." Plaintiff primarily relies on an unpublished case decided by Judge Tidwell of this Court, *Wolfman v. Provident Life and Accident Ins. Co.*, No. 1:98–cv–1658 (N.D.Ga.1999). In *Wolfman*, Judge Tidwell found that "the practice of medicine, in general, is not an activity affecting interstate activity," then held that a private radiology practice "did not directly affect commerce such that ERISA coverage applies." *See Wolfman* [# 66–2] at 5–6.

Although this Court has taken the *Wolfman* case into consideration, it must ultimately depart from the *Wolfman* precedent. Instead, this Court finds that the majority of more recent case law reaches the opposite conclusion. For example, several other courts within the Eleventh Circuit have held that ERISA applies to and preempts claims by plaintiffs in cases involving facts very similar to those at issue in the instant case. In *Stern*, the Middle District of Florida found that ERISA preempted a claim by a physician under a plan obtained by his employer, Radiology Associates of Brevard, P.A. The *Stern* court did not address the issue of whether Radiology Associates was en-

gaged in interstate commerce. Ostensibly, the Middle District of Florida did not address this issue because it was understood that Radiology Associates in fact engaged in interstate commerce, therefore ERISA applied to the disability benefits plan it established for its employees. Similarly, in *Jaffe v. Provident Life and Accident Ins. Co.*, 2000 WL 349750 (S.D.Fla.2000), the Southern District of Florida found that ERISA could apply to an employee benefits plan obtained by Jaffe Eye Institute, a professional association practicing ophthalmology and eye surgery. Although the *Jaffe* court ultimately held that ERISA did not preempt that plaintiff's claims, the *Jaffe* court did find that Jaffe Eye Institute was an "employer" under ERISA and did not mention any interstate commerce defect inherent in the fact that the Jaffe Eye Institute was organized for the purpose of practicing medicine.

The Court also finds persuasive precedent in the United States Court of Appeals for the Fifth Circuit that explicitly rejects the argument Plaintiff asserts here. In *McNeil v. Time Ins. Co.*, 205 F.3d 179 (5th Cir.2000), the Fifth Circuit summarily dismissed the argument that a two-person optometry partnership located in Texas was not an employer engaged in interstate commerce under ERISA. The Fifth Circuit found that merely setting up an insurance policy with an out-of-state insurance company constitutes interstate commerce. *Id.* at 191. Additional activities, such as purchasing glasses from out-of-state, also constituted interstate commerce. *Id.*

The Court therefore rejects Plaintiff's argument that ERISA does not apply to this case because Chattahoochee Orthopedic Clinic is not engaged in interstate commerce. Chattahoochee Orthopedic Clinic, a Georgia professional corporation, entered into two Salary Allotment Agreements with and obtained disability insur-

ance policies from Defendant Provident Life Insurance Company, an insurance company located in Chattanooga, Tennessee. Chattahoochee Orthopedic Clinic processed patients' insurance claims and received payments from insurance companies located out of state. There are no facts in the record regarding the sources from which Chattahoochee Orthopedic Clinic obtained its equipment, medical or surgical supplies, or other necessities of doing business, but it seems probable that the Clinic obtained some or all of these from out-of-state sources. In light of these facts and in deference to *Stern, Jaffe,* and similar precedents, the Court finds that Chattahoochee Orthopedic Clinic was a business engaged in interstate commerce therefore it qualifies as an "employer" under ERISA.

Plaintiff argues that his disability insurance policies are not subject to ERISA because as an owner, he was an "employer," not an "employee" of Chattahoochee Orthopedic Clinic. The Court rejects Plaintiff's argument because it directly contravenes Supreme Court and Eleventh Circuit precedent. *See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon,* 541 U.S. 1, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004) (holding that a working shareholder and president of a professional corporation can qualify as a "participant" in an ERISA employee benefits plan as long as the plan covers employees other than the shareholder); *Gilbert v. Alta Health & Life Ins. Co.,* 276 F.3d 1292, 1302 (11th Cir.2001) ("[A] sole shareholder is a 'beneficiary,' within the meaning of 29 U.S.C. § 1002(8), when he is entitled to benefits from a benefits plan which otherwise qualifies as an ERISA plan."); *see also Slamen v. Paul Revere Life Ins. Co.,* 166 F.3d 1102, 1104 (11th Cir.1999) (holding that ERISA does not apply to an insurance policy owned by an employer-owner where the insurance policy covered only himself but also stating that "in order to establish an ERISA employee welfare benefit plan, the plan must provide benefits to at least one employee, not including an employee who is also the owner of the business in question."). Because the Court finds that the Salary Allotment Agreements between Chattahoochee Orthopedic Clinic and Defendant constitute a "plan" under ERISA and because the Court finds that the plan covered at least one employee, Sheila Mullins Kelleher, at its inception and for its duration, the Court finds that Plaintiff qualifies as a "participant" in the ERISA employee benefits plan at issue here.

Plaintiff argues that the disability insurance policies obtained by him and by other employees of Chattahoochee Orthopedic Clinic are not subject to ERISA because they fall within the regulatory "safe harbor" of 29 C.F.R. § 2510.3–1(j). Under 29 C.F.R. § 2510.3–1(j), ERISA does not apply to an insurance program offered by an insurer to employees if:

(1) No contributions are made by an employer or employee organization;

(2) Participation [sic] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

"All four regulatory requirements must be satisfied in order [for] an insurance plan to qualify for the safe harbor exemption." *Cowart*, 444 F.Supp.2d at 1290.

 The Court finds that the disability insurance plan in the instant case does not fall within this regulatory safe harbor because requirement number one is not satisfied here. Chattahoochee Orthopedic Clinic was Plaintiff's employer and it made contributions to the disability insurance program that is at issue here. Pursuant to the 1981 Salary Allotment Agreement, Chattahoochee Orthopedic Clinic agreed to pay in full the premiums for all policies covered by the agreement. *See* Def.'s Mot. for Summ. J., Ex. 16. Subsequent invoices from Defendant to Chattahoochee Orthopedic Clinic show that Chattahoochee Orthopedic Clinic did in fact pay Plaintiff's annual insurance premiums. *See e.g.* Def.'s Mot. for Summ. J., Ex. 28 (single invoice from Defendant to Chattahoochee Orthopedic Clinic dated April 10, 1985, charging $1,176.64 for Plaintiff's 1974 disability insurance policy, $535.26 for Plaintiff's 1981 disability insurance policy, and $779.36 for Plaintiff's 1983 disability insurance policy, plus eight other charges for other policies held by Clinic employees whose names have been redacted); Ex. 29 (showing that the Exhibit 28 invoice was paid on April 17, 1985); Ex. 33 (single invoice dated October 1986 charging $753.38 for Plaintiff's 1983 disability policy, $1,176.64 for Plaintiff's 1974 policy, and $535.26 for Plaintiff's 1981 policy, plus eight other charges for other policies held by Clinic employees); Ex. 34 (showing that Chattahoochee Orthopedic Clinic paid an invoice similar to Exhibit 33, with line-item charges for each of Plaintiff's disability insurance policies, on September 27, 1991)

Some courts have held that an employer's payment of an employee's insurance premiums does not constitute "contribution" for purposes of the regulatory safe harbor if the employee declares the premium payments as income on his W–2 individual income tax return. *See B–T Dissolution, Inc. v. Provident Life and Accident Ins. Co.*, 175 F.Supp.2d 978, 983 (S.D.Ohio 2001); *see also Cowart*, 444 F.Supp.2d at 1291 (plaintiff's failure to report premium payments as income, and his resulting avoidance of income tax on the premiums, "precludes him from now claiming the premiums as income for ERISA purposes"). Plaintiff has not provided tax returns for every year during which the Salary Allotment Agreement was in effect. However, Plaintiff has provided his 1991 individual income tax return. *See* Crooms Dep., Ex. 1. Exhibit 34 to Defendant's Motion for Summary Judgment shows that Chattahoochee Orthopedic Clinic paid Plaintiff's disability insurance premiums for 1991. Plaintiff did not declare the insurance premium payments as income on his individual income tax return. The Court finds that requirement one is not satisfied here.

Finally, Plaintiff argues that, even if the 1981 and 1983 disability insurance policies are subject to ERISA because they are part of an employee benefits plan, the 1974 policy is not part of the same plan and therefore is not subject to ERISA. Plaintiff argues that the 1974 policy was not issued as part of an ERISA plan. Additionally, if it did become part of any ERISA plan, it only became part of the Salary Allotment Agreement of 1976, under which Chattahoochee Orthopedic Clinic agreed to deduct insurance premiums from employees' salaries but not to pay the premiums for them. Therefore, Plaintiff argues, the 1976 Salary Allotment Agreement falls within the regulatory safe harbor provision discussed above.

Plaintiff admits that the 1974 disability insurance policy was part of the 1976 Salary Allotment Agreement. Plaintiff signed a salary allotment rider to bring the 1974

disability insurance policy under the 1976 Salary Agreement. *See* Def.'s Mot. for Summ. J., Ex. 3. However, Plaintiff contends here and throughout his pleadings that the 1976 Salary Allotment Agreement was not subsumed by and replaced with the 1981 Salary Allotment Agreement. The Court finds that this contention is simply not supported by the record. Although there is no evidence directly showing that all disability insurance policies covered by the 1976 Salary Allotment Agreement transferred over to the 1981 Salary Allotment Agreement, there is circumstantial evidence showing that that is exactly what happened. Chattahoochee Orthopedic Clinic did not purchase all new policies for its employees in 1981 prior to or pursuant to signing the 1981 Salary Allotment Agreement. Invoices provided by Defendant to Chattahoochee Orthopedic Clinic from 1981 and later reflect that the Clinic paid the premiums for a constant number of policies, beginning with nine in 1981 and 1982 and increasing to eleven by 1985 to reflect Plaintiff's acquisition of the 1983 policy and Dr. Broome's acquisition of another disability insurance policy for himself in 1982. *See id.*, Exs. 25, 26, 28, 29, 33, 34, 35. The invoices in the record show that *all* of Plaintiff's disability insurance policies were billed by Defendant directly to Chattahoochee Orthopedic Clinic from 1981 onward. *Id.* Plaintiff's 1974 disability insurance policy, policy number 200627, is always included on the list. *Id.* The Court finds that the fact that Plaintiff did not sign a second salary allotment rider to transfer the 1974 policy to the 1981 Salary Allotment Agreement is not meaningful, because it is clear from the record that all of the extant disability insurance policies held by Chattahoochee Orthopedic Clinic's employees in 1981 transferred to the 1981 Salary Allotment Agreement. Because this Court finds that the 1981 Salary Allotment Agreement does not fall within the regulatory safe harbor provision, the Court finds that ERISA applies to all of Plaintiff's disability insurance policies that were part of that Agreementincluding the 1974 policy.

### 2. *Whether Plaintiff's State Law Claims Relate to the Plan*

ERISA preempts state law claims that "relate to" an employee benefit plan covered by ERISA. 29 U.S.C. § 1144. "[A] state law relates to a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Pilot Life Ins. Co.*, 481 U.S. at 49, 107 S.Ct. 1549 (internal quotations omitted). The Eleventh Circuit has held that a plaintiff's state law breach of contract claims arising out an ERISA plan "relate to" that plan for purposes of 29 U.S.C. § 1144 and are therefore preempted by ERISA. *See Butero*, 174 F.3d at 1215; *Cowart*, 444 F.Supp.2d at 1289.

Plaintiff's state law breach of contract claims, Counts One through Three in the Complaint, relate to Chattahoochee Orthopedic Clinic's employee benefits plan under ERISA in the sense contemplated by the Eleventh Circuit in *Butero*. Likewise, Plaintiff's state law bad faith claim, Count Four in the Complaint, has a connection with the Chattahoochee Orthopedic Clinic employee benefits plan in the sense contemplated by the Supreme Court in *Pilot Life Insurance Company*.

### 3. *Conclusion*

Because this Court finds that Plaintiff's disability insurance policies were part of an "employee benefits plan" under 29 U.S.C. § 1002(1) and Plaintiff's state law claims "relate to" that plan as contemplated by 29 U.S.C. § 1144, this Court finds that Plaintiff's state law claims are preempted by ERISA.

## B. *Waiver and/or Estoppel*

■ Defendant argues that Plaintiff is estopped from asserting any claims, whether arising under state or federal law, under the disability insurance policies because Plaintiff failed to provide timely written notice that his disability was due to "accident" not "sickness." Defendant relies upon the following language in Plaintiff's 1974 and 1981 insurance policies to make this argument:

> Written notice of claim must be given to [Provident] within 20 days after the occurrence of commencement of any loss covered by the policy, or as soon thereafter as is reasonably possible...

> Written proof of loss must be furnished to [Provident]...in case of claim for loss which this policy provides any periodic payment contingent upon continuing loss within 90 days after the termination of the period for which [Provident] is liable...Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than 1 year from the time proof is otherwise required.

*See* Def.'s Mot. for Summ. J., Ex. 3 at 6; Ex. 18 at 6.

Plaintiff asserts that Defendant acknowledged Plaintiff's disability claim with respect to all three disability policies at issue when it sent Plaintiff a notice on February 28, 1992, indicating that it had received Plaintiff's notice of claim form and that it knew from Plaintiff's insurance broker that Plaintiff had become disabled. *See* Loftus Dep., Ex. 5.

The Court finds this issue inappropriate for summary judgment at this stage in the litigation. Plaintiff's claims are based upon Plaintiff's assertion that his disability occurred as a result of an accident in his bathroom. Plaintiff has presented evidence to support his assertion that those around him, including his insurance agent Robert Necessary, knew that this alleged accident was the manner in which his disability occurred. Plaintiff also asserts that Defendant should have investigated his claims, and that in the course of investigation Defendant would have learned that his disability was due to accident not sickness. With these facts in mind, it is arguable that Plaintiff technically adhered to the bare terms of the notice provisions of his insurance contract. Defendant's arguments really go to the sufficiency of Plaintiff's notice of claim.

The sufficiency of Plaintiff's notice of claim is a much larger issue than that argued by Defendant in its Motion for Summary Judgment. For example, the parties have not briefed the Court on issues of constructive notice or Defendant's duty to investigate claims like Plaintiff's. For these reasons, the Court finds the estoppel issue is not ripe for determination and therefore will not grant Defendant's motion for summary judgment on this argument at this time.

## VII. *Conclusion*

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [# 36] is DENIED.

Defendant's Motion for Summary Judgment [# 40] is GRANTED IN PART. The Court finds that Plaintiff's state law claims are preempted by ERISA. Plaintiff shall have fifteen days from the date of this order to amend his Complaint to add an ERISA claim. The Court rejects Defendant's waiver argument and denies that portion of Defendant's Motion for Summary Judgment. Plaintiff's Cross–Motion for Summary Judgment [# 59] is DENIED.

Plaintiff's Motion for Order to Permit Late Filing [# 68] is GRANTED.

The Court also DIRECTS the parties to confer and notify the Court regarding when they think this case will be ready for trial. The parties shall have thirty days to confer and submit this notice to the Court.