# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 12, 2012

Lyle W. Cayce
Clerk

No. 11-20437
Summary Calendar

In the matter of: MARVIN E. MOYE, JMW AUTO SALES; JOAN M. MOYE,

Debtors

WARREN WAITE, JR.; WARREN WAITE, III,

Appellants,

v.

TRUSTEE LOWELL T. CAGE,

Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-cv-01067

Before HIGGINBOTHAM, DAVIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

This appeal arises from a preference action commenced by Lowell T. Cage, Chapter 7 Trustee, seeking to recover payments made by Marvin Moye, Joan Moye, and JMW Auto Sales (collectively, the Debtors) to Warren Waite, Jr. and

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-20437

Warren Waite, III within the 90 day period preceding the filing of JMW's involuntary bankruptcy petition.[1] On November 18, 2010, the bankruptcy court granted summary judgment in favor of Cage, entering a judgment in the amount of $391,948.22 against Waite, Jr. and $16,555.71 against Waite, III. On May 27, 2011, the district court affirmed the bankruptcy court's judgment and this appeal followed. For the following reasons, we AFFIRM.

I.

Before the filing of their respective bankruptcies, the Debtors operated a retail used car business. In addition to selling used cars, the Debtors also provided financing to used car purchasers, regularly charging interest rates ranging from 21% to 23%.

In order to obtain auto loans from the Debtors, purchasers would execute a retail installment sales contract. The Debtors' installment contracts obligated purchasers to repay their auto loans by making regular monthly payments to JMW over a pre-determined period. JMW retained liens on the vehicles that Debtors financed in order to secure repayment of the auto loans.

The Debtors generated additional cash-flow by purportedly selling "pools" of installment contracts to outside pool investors, including the Waites. These purported sales were memorialized in one generic Master Purchase and Sale Agreement (Master Agreement).

The Master Agreement did not reference or provide for the sale of any distinct installment contracts held by JMW. Instead, it established the terms for future installment contract transfers through the pooling arrangement. Specifically, the Master Agreement stated that, at a future "Closing Date," JMW

---

[1] On October 31, 2007, an involuntary Chapter 7 bankruptcy petition was filed against JMW Auto Sales ("JMW") in the United States Bankruptcy Court for the Southern District of Texas. On November 6, 2007, Marvin Moye and Joan Moye filed voluntary Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of Texas. The bankruptcy court has jointly administered JMW's and the Moyes' bankruptcy cases.

would "sell, transfer, assign, endorse, set over, convey, and deliver to Purchaser all right, title, and interest of seller in, to, and under": (i) a pool of yet-to-be-determined[2] installment contracts "accepted by Purchaser on such Closing Date"; and (ii) the underlying "liens and security interests created by the [installment] Contracts." Upon the purported transfer of a pool, a pool investor would then theoretically become entitled to receive all of the principal and interest paid on each installment contract within the pool. Furthermore, as a condition to the effectiveness of the Master Agreement, the Master Agreement required JMW to deliver "an executed Servicing Agreement" to the pool investor "on or before the Closing Date."[3]

Upon the execution of a Master Agreement, the parties bound thereby routinely proceeded to ignore some of the Master Agreement's key terms. JMW would assemble a pool with an aggregate current principal balance equal to the amount a pool investor agreed to pay. Upon receipt of the agreed payment, JMW would begin remitting monthly distributions to the pool investor equal to the full amount of principal and interest due on the installment contracts within the pool, irrespective of the amounts actually collected by JMW.[4] JMW did not, however, endorse any installment contracts to the pool investors. Likewise, JMW did not execute any documents transferring or assigning rights in any specific installment contract to the pool investors. JMW remained the registered lienholder on the certificates of title and never notified vehicle purchasers of any

---

[2] The Master Agreement provided that the installment contracts comprising a pool would be set forth in a "Contract Schedule" that would be "attached as Addendum I to each Bill of Sale delivered by [the Debtors] on each Closing Date."

[3] The Master Agreement's "on or before" language demonstrates the parties' expectation that the "Closing Date" would likely occur after the date of the execution of the Master Agreement.

[4] When Debtors did not collect sufficient funds from vehicle purchasers to meet Debtors' monthly pool payment obligations, Debtors would use their own cash to offset the collection deficiency. Thus, pool investors were not directly exposed to losses caused by defaulting car purchasers.

changes in the ownership of their respective installment contracts.[5] Moreover, at least in the Waites' cases, JMW never delivered any servicing agreements or installment contract schedules as required by the Master Agreement.

Assuming the Debtors' pooling business initially operated legitimately and profitably, the Debtors grew the business well beyond the point of sustainability.[6] In 2007, due to the Debtors' inability to continue making payments to pool investors, the Debtors and some pool investors agreed to sell installment contracts to a third party, Mid-Atlantic Finance Company, at a discounted price. Mid-Atlantic purchased (the "Mid-Atlantic Transaction") certain installment contracts from the Debtors for $1.927 million. The Debtors subsequently paid a portion of the proceeds from the Mid-Atlantic Transaction to pool investors, including $391,948.22 to Waite, Jr. and $16,555.71 to Waite, III.

Cage commenced this action to recover the Debtors' $391,948.22 payment to Waite, Jr. and $16,555.71 payment to Waite, III. On November 18, 2010, the bankruptcy court granted summary judgment in favor of Cage, holding that the Debtors' pre-bankruptcy payments to the Waites constituted avoidable preferential transfers under 11 U.S.C. § 547(b). The Waites unsuccessfully argued that the transfers were outside the scope of § 547(b) because they involved property belonging to the Waites, not property of the Debtors' estate. The bankruptcy court found that the Debtors never sold the installment contracts to the Waites and, therefore, the proceeds of the sale to Mid-Atlantic were property of the Debtors' estate. The bankruptcy court also determined

---

[5] Also, after an installment contract was allegedly transferred to a pool investor, JMW continued to service the note, collect payments, and repossess vehicles in case of default.

[6] According to the Certified Public Accountant employed as an expert witness by Cage, the Debtors operated as an insolvent Ponzi scheme for at least three years before the initiation of JMW's involuntary bankruptcy proceeding. The Debtors relied upon funds from new pool investors in order to meet the monthly obligations owed to existing pool investors. Similarly, the bankruptcy court found that the Debtors defrauded numerous persons, including the pool investors.

that, even if the Master Agreement effectuated a transfer of assets, the transfer to the Waites was illegal and void because the Waites were not licensed to hold the installment contracts under § 348.501(a) of the Texas Finance Code. Accordingly, under either theory, the Waites were creditors of the Debtors who received avoidable transfers pursuant to § 547(b).

On December 3, 2010, the Waites filed a motion to reconsider based upon Waite, Jr.'s receipt (on November 15, 2010) of a reinstated license to hold retail installment contracts. The motion noted that Waite, Jr.'s license was retroactive to September 15, 2002 and argued that the bankruptcy court should reconsider its "illegality" holding. The bankruptcy court denied the motion and the Waites appealed their case to the district court.

On May 27, 2011, the district court affirmed the bankruptcy court's summary judgment in favor of Cage, finding that any transfer of installment contracts to the Waites was void under § 348.501(a) of the Texas Finance Code. The district court also held that the bankruptcy court did not abuse its discretion in denying the Waites' motion to reconsider. This appeal followed.

## II.

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied." *Barner v. Saxon Mortg. Servs., Inc. (In re Barner)*, 597 F.3d 651, 653 (5th Cir. 2010) (citation omitted). We, therefore, review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *Hickman v. Texas (In re Hickman)*, 260 F.3d 400, 401 (5th Cir. 2001). In the summary judgment context, we review the record for genuine issues of material fact and review whether the movant was legally entitled to summary judgment. *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 352 (5th Cir. 2008). Furthermore, we review a bankruptcy court's ruling on a motion to reconsider for an abuse of discretion. *Heller v. Texas Real Estate Comm'n (In re Marinez)*, 589 F.3d 772, 775 (5th Cir. 2009).

Section 547(b) of the Bankruptcy Code enables a bankruptcy trustee to avoid any transfer: (1) of an interest of the debtor in property; (2) to a creditor; (3) on account of an antecedent debt; (4) made while the debtor was insolvent; (5) made within the 90 day period preceding the filing of the debtor's bankruptcy petition; and (6) that enabled the creditor to receive more than it would have otherwise received in a Chapter 7 bankruptcy proceeding had the preferential transfer not been made.  11 U.S.C. § 547(b).

The district court affirmed the bankruptcy court's finding that the Debtors' pre-bankruptcy payments to the Waites satisfied all the elements of § 547(b). The Waites only raise the first two elements of § 547(b) on appeal, arguing that: (1) the Debtors' transfers were not of an interest of the debtor; and (2) the Waites were not creditors of the Debtors.  In this case, the two elements are interrelated because they both hinge upon the Waites' theory that the Debtors transferred their ownership of various installment contracts to the Waites through the pooling arrangement.

The Waites claim that, assuming they both lacked the required license, it was nevertheless erroneous to declare void the  Debtors' alleged transfers of installment contracts to the Waites.  The Waites argue that they obtained full title to their respective installment contracts when they purchased the pools from the Debtors.  Therefore, the Waites allegedly never established a debtor-creditor relationship with the Debtors.  Likewise, the Waites contend that the proceeds of the Mid-Atlantic Transaction were never property of the Debtors because the Waites (and not the Debtors) transferred the installment contracts that they legally owned to Mid-Atlantic.

In determining whether transfers of installment contracts to unlicensed holders are void, we must first review the relevant statutory text.  *McNeil v. Time Ins. Co.*, 205 F.3d 179, 183 (5th Cir. 2000) ("Our analysis of this Texas law begins with statutory construction, a process we approach as a Texas court would.").  "The duty of the court is to construe a statute as written and ascertain

the legislature's intent from the language of the act." *Id.* (citing *Morrison v. Chan*, 699 S.W.3d 205, 208 (Tex. 1985)).

Section 348.501(a) of the Texas Finance Code provides that "[a] person *may not* act as a *holder* [of an installment contract]. . . unless the person: (1) is an authorized lender or a credit union; or (2) *holds a license* issued under this chapter." Tex. Fin. Code § 348.501(a) (emphasis added). The Texas Finance Code defines "holder" as a person who is "a retail seller" or "the assignee or transferee of a retail installment contract." Tex. Fin. Code § 348.001(3). The Waites concede that they do not qualify as authorized lenders or credit unions. Thus, the relevant portions of § 348 simply provide that an unlicensed person "may not" be the "assignee or transferee of a retail installment contract." A plain reading of this language leads to the conclusion that a transaction in contravention of § 348.501(a) is void.[7] To hold otherwise would eviscerate the proscription embodied in the statutory text, enabling an unlicensed person to attain that which only a licensed person is legally entitled to enjoy.[8] *See also*

---

[7] Appellants argue that the statute is ambiguous and direct us to consult additional sources to divine the legislature's intent. Assuming, *arguendo*, that the statute is ambiguous and that it is proper to consult extrinsic sources, which we do not decide, a review of the relevant extrinsic sources supports our analysis. *See Ojo v. Farmers Group., Inc.*, --- S.W.2d ----, 2011 WL 2112778, at *15-16 (Tex. May 27, 2011) (explaining that courts may look beyond the statutory text to extrinsic sources, including the Code Construction Act, in cases of statutory ambiguity); *Cox. v. Hilco Receivables, L.L.C.*, 726 F. Supp. 2d 659, 666 n.3 (N.D. Tex. 2010) (citing *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254-55 (Tex. 1999)) (under Texas law, "administrative rules have the same force as statutes"); Tex. Fin. Code § 1.002 (providing that the Texas Finance Code is subject to the Code Construction Act). The Code Construction Act states, in pertinent part, that the phrase "may not" should be construed to impose "a *prohibition* and is synonymous with 'shall not.'" Tex. Gov't Code § 311.016(5) (emphasis added). In addition, "the Texas Finance Commission, which is the state agency charged with enforcement of the statute, has issued the following rule based on § 348.501(a): 'A person *may not acquire* a retail installment contract . . . unless the person holds a license under Texas Finance Code, Chapter 348 . . . .'" *Cox*, 726 F. Supp. 2d at 666 n.3 (quoting 7 Tex. Admin. Code § 84.401(a)) (emphasis added).

[8] This conclusion is in accord with well-settled Texas law: "in situations where public policy concerns have led to a governmentally supervised statutory licensing scheme, courts have consistently held the unlawful and unlicensed participation in such regulated businesses cannot form the basis for recovery." *Denson v. Dallas County Credit Union*, 262 S.W.3d 846,

*Cox*, 726 F. Supp. 2d at 666 n.3 (finding that an unlicensed, alleged transferee of an installment contract "cannot be owed a debt it cannot legally acquire" under § 348.501(a)); *Denson v. Dallas County Credit Union*, 262 S.W.3d 846, 853-54 (Tex. App.–Dallas 2008, no pet.) (finding that unlicensed car dealer's contracts were void because "the transportation code specifically states that a person *may not* engage in the business of dealing or selling cars without a license") (emphasis added). Accordingly, we conclude that the Debtors were the owners of the installment contracts and that Debtors never transferred or assigned any such ownership interests to the unlicensed Waites.

Our conclusion controls the outcome of this appeal with regard to § 547(b). First, we hold that the Debtors had an interest in the proceeds from the Mid-Atlantic Transaction that were transferred to the Waites. At all times prior to consummation of the Mid-Atlantic Transaction, the Debtors owned–and, therefore, had a legally cognizable interest in–the installment contracts. The Debtors transferred their interests in the installment contracts to Mid-Atlantic in exchange for cash. At that time, the Debtors acquired an interest in the proceeds from the Mid-Atlantic Transaction, a portion of which was later transferred to the Waites. Accordingly, the Debtors had an interest in the proceeds transferred to the Waites.

Second, we hold that the Waites were "creditors" of the Debtors. A "creditor" is an "entity that has a claim against the debtor . . ." 11 U.S.C. §101(10). The term "claim" means a "right to payment . . . ." 11 U.S.C. §101(5).

---

854 (Tex. App.–Dallas 2008, no pet.) (citing *Ahumada v. Dow Chem. Co.*, 992 S.W.2d 555, 558–59 (Tex. App.–Houston [14th Dist.] 1999, pet. denied); *M.M.M., Inc. v. Mitchell*, 153 Tex. 227, 265 S.W.2d 584 (Tex. 1954)); *see also Rogers v. Traders & Gen. Ins. Co.*, 139 S.W.2d 784, 787 (Tex. Comm. App. 1940) ("It appears that all courts agree that where a statute was enacted to protect the public against fraud or imposition or to safeguard the public health or morals, an agreement in violation thereof is ordinarily void.") (quoting 12 Am. Jur. Contracts § 163). Thus, the Waites–as unlawful participants in an industry subject to public policy based regulations–should not be permitted to rely on their alleged illegal acts to protect themselves from the Cage's preference action.

The Waites argue that they were not creditors of the Debtors but merely previous purchasers of the Debtors' interests in various installment contracts. However, as discussed above, the Waites never purchased any installment contracts from the Debtors. Instead, we determine that the Waites entered into a debtor-creditor relationship with the Debtors when they transferred funds to the Debtors in exchange for the right to receive a stream of monthly pool payments. Shortly before the commencement of the Debtors' bankruptcy cases, the Debtors transferred a portion of the Mid-Atlantic Transaction's proceeds to the Waites in order to satisfy, at least in part, the Waites claims against them. The Waites, therefore, were creditors of the Debtors who received pre-bankruptcy transfers intended to reduce the debt owed by the Debtors to the Waites.

The Waites do not appeal the bankruptcy court's findings with regard to any of the other elements of § 547(b). Accordingly, for the reasons set forth above, we hold that the Debtors' transfers to the Waites are avoidable pursuant to § 547(b).[9]

## III.

The Waites also appeal the denial of their motion to reconsider based upon Waite, Jr.'s reinstated license. We determine that the bankruptcy court did not abuse its discretion in denying the motion.

The parties agree that Waite, Jr. did not obtain a reinstated license until after the Debtors' bankruptcy petitions were filed. Section 502(b) of the Bankruptcy Code provides, in part, that "the rights of holders of claims and interests are fixed as of the Petition Date." *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 527 (5th Cir. 2004) (citing 11 U.S.C. § 502(b)). Thus, even if Waite, Jr.

---

[9] The bankruptcy court also found that the Waites were not transferees of Installment Contracts because the Master Agreements did not effectuate a transfer of assets. Since we affirm the district court's decision with regard to the effect of § 348 of the Texas Finance Code, we need not consider whether the Master Agreements were calculated to transfer any assets.

subsequently received a reinstated license (that applied retroactively to September 15, 2002), his rights as a creditor were fixed as of the Debtors' petition dates. Accordingly, the bankruptcy court did not abuse its discretion in denying the motion to reconsider because the existence of the reinstated license would not have altered the bankruptcy court's decision.

## IV.

For the reasons set forth above, the district court's decision is AFFIRMED.